**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-----------------------------------------------------------X
MARTAL COSMETICS, LTD.,

                         Plaintiff,

              - against -

INTERNATIONAL BEAUTY
EXCHANGE INC., et al.,

                        Defendants.
-----------------------------------------------------------X

**REPORT AND
RECOMMENDATION
AND ORDER**
CV 01-7595 (SJF) (JO)

**JAMES ORENSTEIN, Magistrate Judge:**

      Martal Cosmetics, Ltd. ("Martal") accuses a variety of related individual and corporate defendants of trademark infringement related to its "Symba" mark, in violation of the Lanham Act, 15 U.S.C. §§ 1114, 1125, and also asserts claims of unfair competition under the common law of New York. *See* Docket Entry ("DE") 10 (Amended Complaint) ("Complaint") ¶ 1. Martal and some of its adversaries have moved, or cross-moved, for summary judgment with respect to a variety of claims, counterclaims, and affirmative defenses. *See* DE 159; DE 187; DE 272. Anticipating such motion practice, the district judge then assigned to the case referred the matter to the magistrate judge then so assigned for a report and recommendation, which assignment and referral subsequently passed to me. *See* DE 157; DE 319. I now make my report and, for the reasons set forth below, respectfully recommend that the court grant Martal's motion in part and deny in full the two cross-motions. I also resolve a variety of other non-dispositive pre-trial motions by denying the defendants' motion to amend their answer, denying all but one of the defendants' several motions for discovery relief, and denying without prejudice to later renewal the parties' several motions for the imposition of sanctions.

I.    Background

    A.    The Parties

Martal is a British corporation founded by Marcus Sarner ("Sarner") that sells a variety of

health and beauty products under the "Symba" trademark.  Complaint ¶ 1.  Two such products

are at issue in this litigation:  Symba medicated soap ("Symba Soap") and Symba Skin-Lite

Smooth Cream ("Symba Cream").  *Id.* ¶ 27.  As discussed further in the factual recitation below,

various combinations of defendants in this case have sold Symba products, real or counterfeit,

with varying levels of authorization from Martal over time.

The individual defendants are Harry, Jacob, Michael and Rachel Aini (collectively, the

"Ainis"), and Symcha Horowitz ("Horowitz").  The corporate defendants are Homeboys

International, Inc. and Homeboys Discount, Inc. (collectively "Homeboys"); K.A.K. Group, Inc.,

a/k/a International Beauty Exchange, Inc. ("KAK"); I.B.E. Cosmetics, Inc. ("IBE-NY");

International Beauty Exchange, Inc. (a Florida Corporation) ("IBE-FL"); and I.C.E. Marketing,

Corp. a/k/a I.C.E. International Cosmetics Exchange Marketing ("ICE").  For purposes of

discussing the various pending motions, it is convenient to refer to certain groupings of

defendants.  Thus, "Florida Defendants" refers collectively to Horowitz and IBE-FL; "ICE

Defendants" refers collectively to ICE, Michael Aini and Jacob Aini; and "New York

Defendants" refers collectively to all of the ICE Defendants as well as Harry Aini, KAK, IBE-

NY, and Homeboys.

Martal does not seek summary judgment against Rachel Aini, but that defendant does join

with other defendants in seeking various forms of discovery relief and sanctions.  *See* DE 198;

DE 236; DE 312; DE 331; DE 332.  Accordingly, in referring to the "New York Defendants" in

the context of discovery and sanctions motions, I also include Rachel Aini, but do not include her in the term when using it in the context of the various motions for summary judgment.

B.     <u>The Pending Motions</u>

The several parties in this case have filed numerous motions that remain before the court, and in some instances granting or denying the relief requested in one would moot the application made in another. The motions fall into three categories. First, certain parties seek summary judgment. *See* DE 159 (Martal); DE 187 (Florida Defendants); DE 272 (ICE Defendants). The bulk of this report addresses those motions in the order I have cited them.[1] As explained below, I recommend granting Martal's motion for summary judgment in part and denying entirely the request for similar relief by each group of defendants.

Second, various permutations of defendants seek various forms of relief relating to discovery or a proposed pleading amendment. *See* DE 236 (all defendants' joint motion to amend the answer); DE 329 (Florida Defendants' motion for leave to take further discovery of plaintiff); DE 332 (identical motion by New York Defendants); DE 331 (all defendants' joint motion to compel the deposition of Susan Peterson); DE 198 (New York Defendants' motion to take the telephonic deposition of Roger Bundhoo). I address each in turn, in the order I have cited them, and to the extent that granting any motion might affect the record pertinent to consideration of the various motions for summary judgment, I have taken that possibility into

---

[1] One additional claim not addressed in this motion was already the subject of a dispositive motion. On May 21, 2003, the Honorable John Gleeson, United States District Judge, adopted in full the Report and Recommendation of the late Honorable A. Simon Chrein, United States Magistrate Judge, which urged the court to grant Martal's motion for summary judgment with respect to IBE-FL's breach of contract counter-claim and dismiss that claim for want of subject matter jurisdiction. *See* DE 183 *adopting* DE 154 (Report and Recommendation).

account in my analysis of the latter. All of these discovery motions seek non-dispositive pre-trial relief; I am therefore authorized to decide them myself, subject to reconsideration by the assigned district judge. *See* 28 U.S.C. § 636(b)(1)(A); Fed. R. Civ. P. 72(a). Accordingly, my resolution of the discovery motions as discussed below constitutes an order rather than a recommendation.

Third, each group of parties seeks the imposition of sanctions on its adversary or opposing counsel. *See* DE 303 (Martal); DE 306 (Florida Defendants); DE 312 (New York Defendants). Like the discovery motions, these requests seek non-dispositive pretrial relief that may be granted or denied by a magistrate judge. The parties are in agreement that these motions should be addressed last of all. Much water has passed under the bridge since these motions were filed, and the determination of the substantive motions may well affect each party's view as to whether any sanction at all is appropriate or whether it is best to conclude the litigation solely on the merits. I therefore, without further analysis, deny each pending motion for sanctions without prejudice to renewal if, after all of the other motions have been resolved and the parties have conferred in good faith to resolve any remaining differences, the movant wishes to press for such relief. As with any resolution of the discovery matters discussed above, my denial of the motions for sanctions without prejudice to renewal constitutes an order rather than a recommendation, and the parties are free to seek reconsideration of that denial pursuant to Fed. R. Civ. P. 72(a).

C.       The Parties' Submissions

The parties have filed a number of briefs, affidavits, exhibits, and other papers in support of the several motions before me, all of which I have considered, and many of which I cite in the following discussion.  For ease of reference, I have collected all the abbreviations I will use into the following tables:

1.       Martal's Submissions

| DE # | Abbreviation | Description |
|------|--------------|-------------|
| 159 | Martal Notice | Motion for Summary Judgment |
| 159 | Sarner Aff. II | Affidavit of Marcus Sarner dated April 3, 2003 |
| 159 | Kessler Aff. III | Affidavit of Michael G. Kessler dated April 4, 2003 |
| 160 | Martal Memo. | Plaintiff's Memorandum of Law in Support of Motion for Summary Judgment |
| 161 | PX [number] | Plaintiff's Exhibits Vol. I (PX 1 through PX 14) |
| 161 | Sarner Aff. I | Affidavit of Marcus Sarner dated November 13, 2001 (attached to PX2) |
| 161 | Kessler Aff. I | Affidavit of Michael G. Kessler dated November 13, 2001 (attached to PX2) |
| 161 | Kessler Aff. II | Affidavit of Michael G. Kessler dated April 10, 2002 (attached to PX8) |
| 161 | Brown Aff. I | Affidavit of Rodney A. Brown dated April 10, 2002 (attached to PX9) |
| 162 | PX [number] | Plaintiff's Exhibits Vol. II (PX 15 through PX 50) |
| 164 | PX 4A | Plaintiff's Exhibit 4A |
| 165 | PX 4B | Plaintiff's Exhibit 4B |

| DE # | Abbreviation | Description |
|------|-------------|-------------|
| 239 | Martal Stmt. I | Plaintiff's Notice of Motion to Supplement Plaintiff's 56.1 Statement in Support of Motion for summary Judgment, Ex. A (Plaintiff's Supplemental Statement of Material Facts)[2] |
| 246 | Martal FL Opp. | Plaintiff's Memorandum of Law in Opposition to Florida Defendants' Motion for Summary Judgment |
| 247 | Brown Aff. II | Affidavit of Rodney Brown dated October 31, 2003 |
| 250 | Martal Opp. to Amend | Plaintiff's Memorandum of Law in Opposition to Defendants' Motion to Amend Answer |
| 258 | Martal FL Reply | Plaintiff's Reply Memorandum of Law in Support of Motion for Summary Judgment to Dismiss Florida Defendants' Affirmative Defenses and Counterclaims |
| 304 | Martal Discovery Br. | Plaintiff's Memorandum of Law in Opposition to the Defendants' Motion for Leave to Take Further Discovery |
| 334 | Martal NY Opp. | Plaintiff's Memorandum of Law in Opposition to [Certain New York Defendants'] Motion for Summary Judgment |
| 336 | Martal Stmt. II | Plaintiff's Statement of Material Facts in Opposition to [Certain New York] Defendants' Cross Motion for Summary Judgment |
| 337 | Martal NY Reply | Plaintiff's Reply Memorandum of Law in Support of Motion for Summary Judgment Against the New York Defendants |

---

[2]  This submission differs from its predecessor (submitted with DE 159) only in that it contains citations to admissible evidence pursuant to Loc. Civ. R. 56.1(d).  For purposes of this motion, I refer to Martal's later, compliant submission.

2.    The Defendants' Submissions

| DE # | Abbreviation | Description |
|------|-------------|-------------|
| 16 | FL Answer | Florida Defendants' Answer, Affirmative Defenses and Counterclaims |
| 17 | NY Answer | New York Defendants' Answer, Affirmative Defenses and Counterclaims |
| 187 | FL Notice | Florida Defendants' Notice of Motion for Summary Judgment |
| 188 | FL Memo. | Florida Defendants' Memorandum of Law in Support of Motion for Summary Judgment |
| 189 | FL. Stmt. | Florida Defendants' Statement of Material Facts in Support of Motion for Summary Judgment |
| 191 | Horowitz Aff. | Affidavit of Symcha Horowitz dated May 21, 2003 |
| 191 | Ioannou Aff. | Affidavit of Michael J. Ioannou dated May 22, 2003 |
| 198 | Bundhoo Compel | New York Defendants' Motion to Take Deposition of Roger Bundhoo by Telephone |
| 259 | NY Opp. | New York Defendants' Memorandum of Law in Opposition to Motion for Summary Judgment |
| 267 | FL Opp. | Florida Defendants' Memorandum of Law in Opposition to Motion for Summary Judgment |
| 266 | NY Stmt. I | New York Defendants Response to Plaintiff's Supplemental Statement of Material Facts (incorporated by reference by the Florida Defendants, *see* DE 268 at 2, and therefore applicable to all defendants) |
| 266 | NY Stmt. II | New York Defendants' Statement of Material Facts in Opposition to Plaintiff's Summary Judgment Motion and in Support of Defendants' Cross-Motion for Summary Judgment |

| DE # | Abbreviation | Description |
|------|-------------|-------------|
| 268 | FL Opp. Stmt. | Florida Defendants Response to Plaintiff's Supplemental Statement of Material Facts |
| 269 | FL Reply | Florida Defendants' Reply Memorandum of Law in Support of Motion for Summary Judgment |
| 270 | FL Reply Ex. [letter] | Appendix of Exhibits to Florida Defendants' Reply Memorandum in Support of Motion for Summary Judgment |
| 272 | NY Notice | New York Defendants' Notice of Cross Motion for Summary Judgment |
| 273 | NY Memo. | New York Defendants' Memorandum of Law in Support of Cross-Motion for Summary Judgment |
| 279 | DX [number] | Defendants' Exhibits Vol. I (DX 1 through DX 12) |
| 280 | DX [number] | Defendants' Exhibits Vol. II (DX 13 through DX 32) |
| 281 | DX [number] | Defendants' Exhibits Vol. III (DX 33 through DX 71) |
| 330 | FL Compel Br. | Florida Defendants' Memorandum of Law in Support of Motion for Leave to Take Certain Discovery |
| 331 | D Compel Br. | All Defendants' Motion to Compel the Deposition of Susan Peterson |
| 333 | NY Compel Br. | New York Defendants' Memorandum of Law in Support of Motion for Leave to Take Certain Discovery |
| 335 | NY Reply | ICE York Defendants' Reply Memorandum of Law in Support of Cross-Motion for Summary Judgment |

D.    Factual Background

The following factual recitation is drawn from the parties' various submissions and testimony in the record. To the extent there are factual disputes, I note only those that are

pertinent to my proposed resolution of the instant motions.[3]  For additional considerable detail about the extensive procedural history of this litigation, I invite the reader's attention to Judge Chrein's several Reports and Recommendations, which, with one exception, Judge Gleeson adopted in full.  *See*, *e.g.*, DE 88 (recommending that the court confirm an *ex parte* seizure order signed by Judge Gleeson on April 16, 2002), *adopted by* DE 112; DE 117 (recommending that certain sanctions be levied against the defendants and the attorney representing some of them, Michael Ioannou ("Ioannou")) *adopted by* DE 155; DE 154 (recommending that the court grant Martal's motion for summary judgment with respect to IBE-FL's breach of contract counterclaim) *adopted by* DE 183; DE 229 (recommending denial of defendant Rachel Aini's motion for summary judgment) *adopted by* DE 235; DE 233 (recommending the amount of sanctions to be levied against the defendants and Ioannou pursuant to DE 155).[4]

---

[3]  The discussion relies principally on the statements of material facts submitted by the New York Defendants and Martal pursuant to Loc. Civ. R. 56.1 in conjunction with their respective motions for summary judgment.  That rule requires that the moving party submit a statement of material facts that it claims are undisputed to which the non-moving party must respond.  Each party's submission must include citations to admissible evidence.  *See* Loc. Civ. R. 56.1 (a)-(d).  The New York Defendants submitted a statement in response to that submitted by Martal in connection with the latter's motion for summary judgment that purports to controvert numerous facts, but which does not include any citations to admissible evidence as the rule requires. *See e.g.,* NY Stmt. I ¶ 10, 21, 24-31, 33-35, 37-39, 43, 45-46, 50,53, 56, 58-63, 65-68, 70, 72-79. Nonetheless, on the same date, the New York Defendants also submitted a statement of material facts in conjunction with their cross-motion for summary judgment, which does include the requisite citations, *see* NY Stmt. II, and to which Martal subsequently responded, *see* Martal Stmt. II.  For purposes of this discussion, I have reviewed all four submissions and endeavored to identify those facts on which either the parties agree or have failed to controvert on the basis of any admissible evidence.

[4]  As far as I can determine from the electronic docket, after the New York Defendants filed timely objections to the latter report, DE 243, and Martal responded to those objections, DE 249, no district judge has acted on Judge Chrein's recommendation.  My denial without prejudice of the pending sanctions motions applies only to those that Judge Chrein did not previously address; I do not recommend that the court vacate or ignore Judge Chrein's recommendations with respect

1.      <u>Martal's Cosmetic Products And The Relevant Trademarks</u>

As noted above, Sarner founded Martal as a corporation organized under the laws of Great Britain for the purpose of selling health and beauty products under the "Symba" trademark. *See* Sarner Aff. I ¶¶ 1, 3. This litigation concerns two of those products: Symba Soap and Symba Cream. *See* Martal Stmt. ¶ 1. Symba Soap is manufactured as a blue rectangular tablet with the Symba trademark embossed upon it and is packaged in "orange cartons with white and red lettering and white and brown dots." *Id.* ¶ 23; *see also* PX 2 Ex. C (image). The packaging for Symba Cream – including both the tube in which the cream is contained and the box in which the tube is distributed – carries similar markings. *Id.*; *see also* PX 2 Ex. F (image).

The Patent and Trademark Office ("PTO") has issued certificates of registration to Martal for, respectively, Symba Soap (No. 1,372,091) and a class of goods that includes Symba Cream (No. 1,480,368). *See* Martal Stmt. ¶ 22; PX 2 Ex. A (certificates). As discussed in greater detail below, the defendants dispute the validity of those trademark registrations. *See* NY Stmt. I ¶ 22.

2.      <u>The Defendants And Their Role In Distributing Martal's Products</u>

As their common surname suggests, the Ainis are all members of the same family. Michael Aini, Harry Aini and Jacob Aini are all brothers, and Rachel Aini is married to Jacob Aini. NY Stmt. II at 22. Each of the three Aini brothers is or has been a shareholder or an officer of various of the New York corporate defendants. Martal Stmt. I ¶ 20.

---

to motions he did address. I note that I have already discovered a number of instances in which documents were submitted to the court but not entered on the electronic docket. I direct any party that is aware of an order acting on the objections to Judge Chrein's Report and Recommendation to notify the court of that fact, and to submit a copy of any such order if available, by October 6, 2006.

During the late 1980s, Martal distributed its products in the United States exclusively through Jacob Aini and the various corporate entities with which he has been associated, including IBE-NY, ICE, and KAK. *See* Sarner Aff. I ¶ 9. Jacob Aini acted as a consultant to ICE and IBE-NY for the sale and distribution of beauty products, including Symba products. *See* PX 17 (Deposition of Jacob Aini) ("J. Aini Dep.") at 44-48, 53-54, 62, 124-126. Harry and Michael Aini were also engaged in the distribution of beauty products through the corporate entities which they own and operate. Harry Aini is the President and sole shareholder of IBE-NY and Homeboys, and was the sole individual with the authority to write checks on behalf of IBE-NY. *See* Martal Stmt. I ¶ 19; J. Aini Dep. at 226; *see also* PX 20 (check to IBE-NY signed by Harry Aini for Symba Cream). IBE-NY is a distributor of health and beauty products, while Homeboys is a retail establishment in Brooklyn, New York that sells such products. Martal Stmt. I ¶ 65; NY Stmt. II ¶ 26. Michael Aini is the owner and sole shareholder of ICE. *See* Martal Stmt. I ¶ 66.

ICE imports and manufactures health and beauty products. Martal Stmt. I ¶ 66. ICE and IBE-NY share office space at 56-25 Flushing Avenue in Maspeth, New York (the "Maspeth location"), where the three Aini brothers all work. Martal Stmt. I ¶ 17. Michael Aini was also an owner of KAK, which apparently did business as "International Beauty Exchange" until mid-1999 when its assets and business were purchased by IBE-NY. *See* NY Stmt. II ¶ 25.

In the latter part of the 1990s, Martal also began distributing its products through Horowitz and his company IBE-FL, which Martal understood to have a business relationship with Jacob Aini and his companies, and to be partly owned by Rachel Aini. Sarner Aff. I ¶ 10.

3.      The Discovery of Allegedly Counterfeit Goods

At the heart of the dispute in this case is Martal's assertion that the defendants were involved in a scheme to distribute counterfeit copies of Martal's products. Strangely enough, there is no dispute that it was one of those accused defendants that first alerted Martal to the possibility of such counterfeiting: in 1997, IBE-FL informed Martal that it had "discovered" less expensive Symba Soap and Symba Cream in the market and forwarded samples of its discovery to Martal in order to determine their authenticity. In April 1999, IBE-FL again forwarded additional samples of suspected counterfeit merchandise to Martal. Martal Stmt. I ¶ 29; NY Stmt. II ¶¶ 32-33.

At around the same time that the defendants were notifying Martal of the appearance of apparently counterfeit Symba products in the market, Martal claims that the volume of business it did with the defendants dropped. *See* Martal Stmt. ¶ 29. Apparently in an effort to find out more information about the counterfeiting problem, in early 1999 Martal had an investigator purchase a sample of Symba Soap at "a Homeboy's store in New York;" upon subsequent analysis, Martal determined that the sample was counterfeit. *See* Martal Stmt. ¶ 30; *see also* Sarner Aff. I ¶ 12.

Shortly after determining that the sample purchased from Homeboys was counterfeit, Martal notified the Food and Drug Administration (FDA) of the problem. Although the FDA commenced an investigation, the agency ultimately declined to take independent action and notified Martal as to the available private civil remedies. *See* Sarner Aff. I ¶ 13.

In March 1999, Martal decided that one way to combat the counterfeiting problem was to change its distribution method so as not to rely on exclusive arrangements. Martal sent Jacob Aini and Horowitz a letter informing them of this decision, which terminated their exclusive

distribution rights.  *See* PX 18 (letter from M. Sarner to "Simcha and Jack" dated March 12,

1999). Sarner's letter did not accuse either recipient of being responsible for marketing the

counterfeit Symba products:

> As it is probable that the counterfeiting is being carried out by those who have no access to the original products from us; after consulting our advisers we have reluctantly come to the conclusion that the only way to fight the counterfeit products – which because of their inferior quality are a serious threat to the good name and reputation of Symba products (a greater threat in fact than the competing brands on the market), – is to make all Symba products freely and directly available in all affected markets to all those buyers who wish to purchase in substantial quantities, effective immediately.

*Id.*; *see also* Sarner Aff. I ¶ 14.

    4.    The Counterfeit Investigation

In anticipation both of initiating its own civil proceedings for trademark infringement and

seeking to persuade law enforcement authorities to commence parallel criminal proceedings,

Martal subsequently retained the firm of Michael G. Kessler & Associates (the "Kessler Firm") to

conduct an investigation to determine who was responsible for the counterfeit goods.  *See* Sarner

Aff. I ¶ 15; *see also* Kessler Aff. I ¶ 3.  Notwithstanding its statement to Jacob Aini and Horowitz

that it suspected "those who have no access to the original products" of being responsible for the

counterfeiting, PX 18, the investigation focused on the Ainis and the corporate entities with

which they were associated.  Martal explains this investigative focus on the fact that its initial

purchase of allegedly counterfeit product was from Homeboy's, which it knew to be one of the

Ainis' businesses.  *See* Martal Stmt. ¶ 33; *see also* Sarner Aff. I ¶ 15.

As part of its investigation, the Kessler Firm bought samples of both Symba Soap and

Symba Cream from KAK, which at the time was known as "International Beauty Exchange," at

its Manhattan location. *See* Martal Stmt. ¶ 34; NY Stmt. II ¶ 67.[5] Martal sent the purchased

samples of each product to the "exclusive" manufacturer to be tested for authenticity; it thus sent

the soap samples to Milo Cosmetics, Ltd. ("Milo"), and the cream samples to E-Pac International,

Ltd. ("E-Pac"). *See* Sarner Aff. I ¶¶ 16-17; Kessler Aff. I ¶¶ 4-5. On the basis of Sarner's own

visual inspection of the samples' packaging and the manufacturers' chemical analyses, Martal

concluded that the samples were counterfeit. Martal cites several specific characteristics of each

product for its conclusion in this regard. With respect to the soap, Martal asserts that the sample

purchased from IBE-NY differed from genuine Symba Soap in several respects:

- the sample's packaging did not contain Martal's address, unlike the packaging of genuine Symba Soap, which does;

- the sample's packaging declared a weight of 3.0 oz., unlike the packaging of genuine Symba Soap, which declares a weight of 2.8 oz.;

- the sample's packaging used the "™" trademark symbol, unlike the packaging of genuine Symba Soap which uses the "®" registration symbol;

- the sample's packaging used English text on the rear panel, unlike the packaging of genuine Symba Soap which uses French text on that panel;

- the sample's packaging included a red flash on one side with the text "Guaranteed quality," unlike the packaging of genuine Symba Soap, which uses the English text "New, improved formula" on one side and the French text "Nouvelle formule amelioree" on the other;

---

[5] The New York defendants initially purported to controvert the entire series of events recited in this paragraph and the next. *See* NY Stmt. I ¶¶ 34-35 (each of which consists of the single word, "controverted"). In a subsequent submission they concede that the purchases were made but seek to challenge the conclusion that any of the purchased goods were counterfeit. *See* NY Stmt. II ¶¶ 67, 99-107. Their challenge consists of a series of attacks on Kessler's qualifications with respect to identifying counterfeit Symba products. *See id.* ¶¶ 99-107. Because they never discuss or otherwise refute the respective manufacturer's testing of the products, I conclude that there is no dispute with respect to the events recited in these paragraphs.

- the sample's packaging did not include a stamp on its rear panel reading "Made in England," unlike the packaging of genuine Symba Soap;

- the sample's packaging did not contain an expiration date, unlike the packaging of genuine Symba Soap;

- the sample soap tablet was not wrapped in cellophane, unlike genuine Symba Soap;

- the color and odor of the sample soap tablet differed from genuine Symba Soap; and

- the sample soap did not contain either of the active ingredients contained in genuine Symba Soap (1% Triclorcarban and 0.1% Allantoin).

Sarner Aff. I ¶ 16; *Id.*, attached Milo Certificate of Analysis; *compare* Sarner Aff. I, Ex. C (genuine Symba Soap) *with* Sarner Aff. I, Ex. D (sample purchased from IBE-NY).

The cream sample likewise differed from genuine Symba Cream in several specific ways:

- the sample was packaged in a tube with a 9-millimeter nozzle, unlike genuine Symba Cream, which is packaged in a tube with an 11-millimeter nozzle;

- the sample's tube had a crimp style and a format for the expiration date both of which differed from the style and format of genuine Symba Cream tubes;

- the sample's tube was colored a different shade of orange than tubes of genuine Symba Cream; and

- the sample contained a lower percentage of hydroquinone than genuine Symba Cream.

Sarner Aff. I ¶ 17; *Id.*, Ex. E (letter from E-Pac detailing analysis); *compare* Sarner Aff. I, Ex. F (image of genuine Symba Cream packaging) *with* Sarner Aff. I, Ex. G (image of packaging from sample purchased from IBE-NY).

In early 2000, Martal directed the Kessler Firm to purchase additional samples from IBE-NY at its new location in Maspeth, New York. *See* Kessler Aff. I ¶ 6. After determining that

these new samples had "all" of the same characteristics as those previously purchased, Martal contacted the Queens District Attorney's Office ("Queens DA"), which indicated that it would begin an investigation into the matter. *Id*. ¶ 7. In September 2000, the Kessler Firm made another purchase of Symba Soap and cream at IBE-NY's Maspeth location, determined that these new samples were also counterfeit, and forwarded the results of its analysis to the Queens DA. *Id*. On July 16, 2001, the Queens DA obtained a warrant to search the Maspeth location; its execution of that warrant yielded 113 boxes of Symba Cream that Martal asserts are counterfeit. *See* Kessler Aff. III ¶ 4; PX 33 (Property Inventory Report).

On November 15, 2001, Martal filed the instant lawsuit against the defendants. DE 1. At the same time, it sought and obtained from Judge Gleeson an *ex parte* seizure order authorizing it to seize all allegedly infringing goods and related records from the Maspeth location. *See* DE 2 (the "November order"). Judge Gleeson's order also included a Temporary Restraining Order precluding the defendants from undertaking various actions related to products bearing the Symba mark including, for example, using such products or possessing or selling products "bearing a copy or colorable imitation of the Symba trademarks and/or the Symba trade dress." *Id*. at 2-4. The United States Marshal, together with Martal's counsel and the Kessler Firm executed the seizure order on November 20, 2001, and confiscated six cases of allegedly counterfeit Symba Soap, four cases of allegedly counterfeit Symba Cream, an unmarked box containing additional suspect Symba Cream, and various documents. *See* Kessler Aff. III ¶ 5; *see also* PX 3 (inventory of seized items). Among the records seized from the Maspeth location were invoices reflecting sales to various retail outlets.

On December 11, 2001, the parties notified Judge Gleeson that they had consented to a preliminary injunction the terms of which were virtually identical to those of the Temporary Restraining Order included in the November order. *See* DE 11 (Order including Preliminary Injunction dated December 11, 2001).

Between March 25, 2002 and April 3, 2002, the Kessler Firm, continuing its investigation, made eight separate purchases of allegedly counterfeit Symba products from the retail outlets identified in the seized records including HomeBoy's Discount Inc., as well as other businesses not a party to this action. *See* Kessler Aff. II ¶¶ 8-9 (documenting the purchases); *see also* Brown Aff. I ¶ 11 (listing stores allegedly selling counterfeit Symba products). The Kessler Firm also learned of the existence of "a concealed storage area" at the Maspeth location. Kessler Aff. II ¶ 10; *see also* Brown Aff. I ¶ 3. Based on that information, Martal sought and the court issued, an order authorizing the search of the "hidden component of the warehouse" and the seizure of any allegedly counterfeit products found therein. *See* Order to Show Cause For Additional Ex Parte Seizure signed by Judge Gleeson on April 16, 2002 (the "April order"); Brown Aff. I ¶ 3.[6]

On April 24, 2002, the United States Marshals, Martal's counsel, and the Kessler Firm, acting pursuant to the April order, confiscated 116 cartons of allegedly counterfeit Symba Cream (containing a total of 16,704 individual tubes) and 43 cartons of allegedly counterfeit Symba

---

[6] The defendants continue to deny that this hidden space was a part of its warehouse and attempt to revive their argument that the space was sub-leased to an unrelated entity, non-party MB. *See* NY Stmt. I ¶ 45; NY Stmt. II ¶¶ 93-94. Judge Chrein has already flatly rejected their position in that regard; he found that the third space was part of the 56-25 warehouse and that MB was not a distinct entity from Jacob Aini. *See* DE 88 (Report and Recommendation dated July 24, 2002) at 10-12. I defer to those findings, which Judge Gleeson adopted, DE 112, and which are the law of the case.

Soap (containing a total of 6,192 individual bars) from the Maspeth location. *See* Martal Stmt. ¶¶ 44-45.

Of the 43 boxes of the suspect Symba Soap seized, 42 contained product with the same characteristics as the samples that the Kessler Firm had purchased during its investigation in 1999. *See* Sarner Aff. II ¶¶ 3-5; Kessler Aff. II ¶¶ 7-8; *see also* PX 29 (trade dress of seized product); PX 24 (chemical analysis of seized product noting that the product marked Sample No. 1, like the previously purchased allegedly infringing Symba Soap did not contain Triclocarban or Allantoin). The remaining box contained allegedly counterfeit product with a chemical composition different from both the goods previously purchased by the Kessler Firm and genuine Symba Soap. *See* Sarner Aff. II ¶¶ 3-8; Kessler Aff. II ¶¶ 8-9; *see also* PX 30 (trade dress of seized product); PX 24 (chemical analysis of seized product noting that the product marked Sample No. 2 differs in composition from genuine Symba Soap).[7] Likewise, Martal's exclusive cream manufacturer confirmed that the cream obtained in this latest seizure was also counterfeit, and that its packaging differed from genuine Symba Cream in the same ways as samples obtained in 1999. *See* Sarner Aff. II ¶ 9; Sarner Aff. I ¶ 17 (description of differences between products); Sarner Aff. I, Ex. E (chemical analysis of product seized in 1999); *see also* PX 31 (photocopy of trade dress); PX 26 (chemical analysis of product seized in 2002).[8]

---

[7] In contrast to genuine Symba Soap, the soap in this box contained 0.31 % Triclocarban (unlike genuine Symba Soap, 1.0 % of which is that substance), the active ingredient Triclosan (an ingredient not present in genuine Symba Soap), and did not contain any Allantoin (an ingredient present in genuine Symba Soap). *See* Sarner Aff. II ¶ 8; *see also* PX 24.

[8] This time, the manufacturer also pointed out numerous misspellings on the seized cream tubes that do not appear on genuine Symba Cream tubes. *See* PX 25 (including the words "unly," "consulf," "recomend," and "pregant" apparently in lieu of, respectively, "only," "consult," "recommend," and "pregnant").

The New York Defendants contend that they "do not have sufficient information at this time to admit or controvert Plaintiff's statements" – although it is self-evident that they have had ample opportunity at least to make their own evaluation of the seized products and have not done so. NY Stmt. I ¶ 48; DE 267, Ex. C (deposition transcript of Michael Kessler) at 438-443. Indeed, the New York Defendants offer little direct evidence of their own in their largely failed endeavor to identify a genuine dispute about a material factual issue. Rather, they rely almost entirely on raising questions about the sufficiency of the evidence put forth by Martal. Nonetheless, as discussed in greater detail below, the New York Defendants vigorously oppose Martal's contention that the products seized are counterfeit and that they sold or distributed counterfeit products. *See* NY Stmt. I ¶¶ 34-48.

II.     Summary Judgment:  The Applicable Legal Standard

A judge deciding a motion for summary judgment does not "'weigh the evidence and resolve factual issues'" but instead "'determine[s] as a threshold matter whether there are genuine issues of material fact to be tried.'" *Owens v. New York City Hous. Auth.*, 934 F.2d 405, 408 (2d Cir. 1991) (quoting *Gibson v. Am. Broadcasting Cos.*, 892 F.2d 1128, 1132 (2d Cir. 1989)); *see* Fed. R. Civ. P. 56(c). A fact is material if it "'might affect the outcome of the suit under the governing law.'" *Holtz v. Rockefeller & Co., Inc.*, 258 F. 3d 62, 69 (2d Cir. 2001) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A genuine issue is presented if "'the evidence is such that a reasonable jury could return a verdict for the non[-]moving party.'" *Id*. (quoting same). However, "[t]he non-moving party may not rely on conclusory allegations or unsubstantiated speculation." *Scotto v. Almenas,* 143 F.3d 105, 114 (2d Cir. 1998) (citing *Wright v. Coughlin,* 132 F.3d 133, 137 2d Cir. 1998)). Instead, the non-movant must produce specific

facts indicating that a genuine factual issue exists. *Id.* (internal quotation marks omitted); *see also Harlen Assoc. v. Inc. Village of Mineola*, 273 F.3d 494, 499 (2d Cir. 2001) ("mere speculation and conjecture is insufficient to preclude the granting of the motion") (citations omitted). "The trial court's function at [the summary judgment] stage is to identify issues to be tried, not decide them." *Graham v. Long Island R.R.*, 230 F.3d 34, 38 (2d Cir. 2000).

I apply these legal principals in assessing each party's summary judgment motion. Where, as here, multiple parties move for summary judgment, "each party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration." *Morales v. Quintel Entm't, Inc.*, 249 F.3d 115, 121 (2d Cir. 2001) (citing *Schwabenbauer v. Bd. of Educ.*, 667 F.2d 305, 314 (2d Cir. 1981)).

III.    Martal's Motion For Summary Judgment

In addressing Martal's motion, I first address (in section A below) the merits of Martal's claim of trademark infringement under the Lanham Act against the New York corporate defendants, and conclude that Martal has met its burden of establishing both elements of such a claim against all such defendants with respect to Symba Soap, but not with respect to Symba Cream. I then address (in section B) the related claims that Martal asserts under state law, and find that it has established those claims against the corporate defendants as well. I next examine the record with respect to each of the individual New York Defendants (in section C), and conclude with respect to Harry and Michael Aini that the evidence suffices to hold each such defendant individually responsible for the infringing conduct of the corporate entities with which they are associated, to the full extent that such entities are ultimately found liable. With respect to Jacob Aini, I conclude that there is a genuine issue of material fact as to his personal liability

that cannot be resolved on the current record. I then consider (in section D) whether, notwithstanding my analysis of Martal's affirmative claims, there is a reason to deny its motion for summary judgment on the strength of the affirmative defenses and counterclaims that all of the defendants have raised. Concluding that most of those defenses and counterclaims are no bar to Martal's recovery with respect to Symba Soap, I go on to consider (in section E) whether summary judgment in Martal's favor is premature in light of the defendants' various requests to amend the answer and compel further discovery. I conclude with respect to Symba Soap that it is not, and that the court should therefore enter partial summary judgment in Martal's favor. With respect to Symba Cream, I find that further discovery of Sarner's knowledge and awareness of the goods listed in the 368 Application is necessary before the court can rule on Martal's motion for summary judgment.

     A.     <u>Martal's Trademark Claims Against The New York Corporate Defendants</u>

     1.     <u>The Elements Of A Claim Based On The Lanham Act</u>

Martal brings this action for trademark infringement and false designation pursuant to the Lanham Act, 15 U.S.C. § 1051, *et seq*., specifically §§ 1114(1) and 1125(a) for the sale and distribution of counterfeit products and for injury to business reputation, dilution of mark, and for unfair competition pursuant to New York General Business Law § 368-d and New York common law. *See* Complaint ¶ 1. Martal claims that the defendants engaged in the distribution, sale, and offering for sale of counterfeit products closely resembling Martal's Symba brand (Trademark Registration Nos. 1,372,091 and 1,480,368, *see id.*) on the basis of its undercover investigation into the matter and the allegedly counterfeit products seized pursuant to court order. *See* Martal Memo. at 7. The defendants dispute Martal's allegations on numerous grounds, specifically:

whether the trademarks at issue are valid; whether the products are counterfeit within the meaning of the statute; the reliability of Martal's investigation; whether the defendant corporations actually sold, distributed or otherwise used in commerce any counterfeit Symba products; and whether any consumer confusion has occurred as a result of the sale of the allegedly counterfeit Symba products. *See* NY Opp. at 11-12.

The Lanham Act provides a right of action against persons who, without consent, "use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive." 15 U.S.C. § 1114(1)(a). The Lanham Act also creates liability for "[a]ny person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact" that is likely to cause confusion. 15 U.S.C. § 1125(a)(1). The elements that must be demonstrated in order to recover are the same for each section. *See Gucci Am. Inc. v. Action Activewear, Inc.*, 759 F.Supp. 1060, 1063 (S.D.N.Y. 1991). First, the plaintiff must establish ownership of a valid trademark and second, that "the defendants use of the trademark creates a likelihood of confusion as to the source of the goods." *Id*. (citing *Lois Sportswear U.S.A., Inc. v. Levi Strauss & Co.*, 799 F.2d 867, 871 (2d Cir. 1986)). In determining whether "ordinary prudent purchasers are likely to be misled, or indeed simply confused" courts consider eight factors set forth in *Polaroid Corp. v. Polarad Electronics Corp*., 287 F.2d 492, 495 (2d Cir. 1961):

> (1) the strength of the senior mark; (2) the degree of similarity between the two marks; (3) the proximity of the products; (4) the likelihood that the prior owner will "bridge the gap"; (5) actual confusion; (6) the defendant's good faith (or bad faith) in adopting its own mark; (7) the quality of defendant's product; and (8) the sophistication of the buyers.

*Savin Corp. v. Savin Group*, 391 F.3d 439, 456 (2d Cir. 2004) (citing *Polaroid Corp.,* at 495). However, in cases claiming the marks at issue are counterfeit "the Court need not undertake a factor-by-factor analysis under *Polaroid* because counterfeits, by their very nature, cause confusion." *Gucci Am., Inc., v. Duty Free Apparel, Ltd.*, 286 F. Supp.2d 284, 287 (S.D.N.Y. 2004) (citation omitted)). Therefore, the Court "need only determine the more fundamental question of whether there are items to be confused in the first place – that is, whether the items at issue here are, in fact, counterfeit, and whether Defendants sold those items." *Id.*

    2.    <u>Ownership Of Registered Trademarks</u>

    a.    <u>Symba Cream</u>

Martal is the registered owner of the Symba trademark (Registration No. 1,480,368) ("368 Registration") for use with "cosmetics and toiletries, namely, skin lotions, skin creams, toilet soaps, and perfumes." Sarner Aff. I Ex. A (Certificate of Registration). Such ownership is considered "*prima facie* evidence of the validity of the mark and of the owner's exclusive right to use the mark in commerce." *Rick v. Buchansky*, 609 F. Supp. 1522, 1529 (S.D.N.Y. 1985) (citing 15 U.S.C. § 1115(a); *Cartier, Inc. v. Three Sheaves Co., Inc.,* 465 F. Supp. 123, 127-128 (S.D.N.Y. 1979)). The New York Defendants seek to rebut this presumption of validity with evidence that the registration at issue contained material misrepresentations sufficient to render the registration void *ab initio. See* NY Opp. at 12-15. Raising a question of fact on this score

would suffice to defeat Martal's motion for summary judgment.  *See Universal Nutrition Corp. v. Carbolite Foods, Inc.*, 325 F. Supp.2d 526, 531 (D.N.J. 2004).

In particular, the defendants claim that Sarner's written responses to deposition testimony raise a question of fact as to whether Sarner misrepresented the date on which the goods claimed in the trademark application were first used in commerce.  NY Opp. at 14-15.  As discussed below, I find that the evidence the New York Defendants have introduced does raise a question of fact as to the validity of the 368 Registration, albeit for a reason that differs somewhat from the precise argument the New York Defendants make in their motion papers.

The application for what became the 368 Registration was filed on April 14, 1987. Pursuant to then-applicable federal regulations governing trademark applications, Martal was required to state in its application "[t]he date of [its] first use in commerce of the mark as a trademark on or in connection with goods specified in the application."  37 C.F.R. § 2.33(a)(1)(viii) (1987).  The application cites January 1984 as the relevant date.  *See* DX 11 (application for the 368 Registration signed by Sarner) at 4.  The New York Defendants note that in the response to a discovery request in this litigation, Sarner said that neither the lotion nor the perfume was in commerce as of that date, and on the basis of that answer they assert that the application's reference to the date of first use was a material misstatement.  *See* NY Opp. at 13-15 (citing DX 7 at 10-11) (Sarner's response to defendants' deposition question 27).  They further note that, in response to a separate question about whether Martal had used Symba lotion or perfume in commerce in January 1984, Sarner stated that Martal had not used Symba lotion and perfume in commerce until "in or about 1989."  *See id.* at 11 (Sarner's response to defendants' deposition question 28).

The specific argument the New York Defendants make is that because these responses suggest that Symba lotion and perfume were not in fact used in commerce in 1984, the patent application's averment as to the date of first use constituted a fraudulent misstatement. *See* NY Opp. at 13-15. As Martal correctly notes, however, where an application lists multiple goods, the trademark regulations only require that the date of first use provided in the application apply to *one* of the goods in question. *See* Martal NY Reply at 1 (incorporating by reference arguments raised in Martal Opp. to Amend at 4-7) (citing U.S. Dep't of Commerce, Patent & Trademark Office, Trademark Manual of Examining Procedure ("PTO *Manual*") § 903.09); *see also* 37 C.F.R. § 2.33(a)(2)(1987) ("If more than one item of goods is specified in the application, the dates of use required ... need be for only one of the items specified).[9] The defendants do not introduce any other evidence in support of their argument that Sarner's averment as to the date the mark was first used in commerce with respect to the listed goods was a misstatement, and thus their argument in this regard must fail.

Nonetheless, I find that Sarner's testimony that two of the items were not used in commerce until "in or around 1989" does raise a question of fact as to the validity of the trademark registration. Sarner's responses suggest that not all of the items for which the 368 Registration was issued were in fact in commerce at the time of the application. That Sarner knew this at the time of his deposition in 2003 suggests that he likely knew or should have known this to be the case when he signed the application for the 368 Registration in 1987. Such

---

[9]   The PTO *Manual* that Martal relies on in turn cites regulations that were promulgated after Martal filed its trademark registration application. This error does not affect my analysis, which relies on the regulations in effect on April 14, 1987, when Martal submitted its application. *See* DX 11 (Application for 368 Registration).

knowledge at the time of the application could suffice to declare the 368 Registration invalid, and thereby extinguish Martal's right to recover for infringement of that trademark. *See Gen. Car and Truck Leasing Sys. Inc. v. General Rent-A-Car, Inc.*, 17 U.S.P.Q.2d 1398, 1399-1401 (S.D. Fla. 1990) (applicant's knowing overstatement of breadth of goods covered by a registration grounds for cancellation of the registration); *see also W. Farmers Assoc'n v. Loblaw Inc.*, 180 U.S.P.Q. 345, 347 (same). Indeed, because it was a requirement that all of the identified goods had been used in commerce at the time of the application, it seems axiomatic that a misstatement in this regard would be a material one. *See* 37 C.F.R. § 2.33(a)(1)(v). Martal does not dispute Sarner's statements as to the date the mark was first used for Symba lotion and perfume nor does it introduce any contrary evidence to rebut them. Accordingly, I find that sufficient questions of fact exist with respect to the 368 Registration to preclude summary judgment in Martal's favor with respect to Symba Cream.

In framing the issue above, I wrote that the defendants' ability to raise a question of fact regarding the validity of the trademark for Symba Cream would suffice to defeat Martal's motion for summary judgment on its Lanham Act claims relating to that product. For all practical purposes that is my view, but I add this additional note to clarify with greater precision the procedural posture in which I recommend leaving the case. As noted above, Martal's ownership of the registered trademark for the class of products that includes Symba Cream entitles it to a presumption that constitutes "*prima facie* evidence of the validity of the mark and of the owner's exclusive right to use the mark in commerce." *Rick v. Buchansky*, 609 F. Supp. 1522, 1529 (S.D.N.Y. 1985) (citing 15 U.S.C. § 1115(a); *Cartier, Inc. v. Three Sheaves Co., Inc.,* 465 F.Supp. 123, 127-128 (S.D.N.Y. 1979)). To the extent that the defendants would seek to

overcome that presumption, they do so by asserting an affirmative defense. *See* NY Answer at 8-9; FL Answer at 8-9.

In concluding that there exists a genuine issue of material fact that precludes summary judgment on this score, I do not intend to convey that Martal has failed to meet its burden of establishing a *prima facie* Lanham Act claim with respect to Symba Cream – it has, in fact, done so. Rather, I mean only that the New York Defendants have demonstrated the existence of a genuine dispute of fact that is material to an affirmative defense which, if established, would be a bar to Martal's recovery. Accordingly, in denying Martal summary judgment to the extent there remains a question about the validity of the registration for Symba Cream, I recommend no more than that the court permit the defendants an opportunity to prove their affirmative defense of invalidity by a preponderance of the evidence. If they cannot, Martal should prevail on the basis of the presumption of validity the law accords to its trademark registration.

        b.    <u>Symba Soap</u>

Martal also claims ownership of the Symba mark (Registration No. 1,372,091) (the 091 Registration) for use in connection with "medicated toilet soap." Sarner Aff. I Ex. A (Certificate of Registration) The defendants attack the validity of this mark on two grounds related to their contention that Martal included mercury in the soap at the time it sought the registration: first, they claim that Martal did so in violation of a federal regulation barring the use of that substance in cosmetic products, 21 C.F.R. § 700.13 (1987); second, they claim that Martal's statements on the matter have been inconsistent and that the registration may, as a result, be void *ab initio*. *See* NY Opp. at 16. As explained below, these challenges do not suffice to forestall summary judgment for a number of reasons.

First, the defendants' reliance on the federal regulation they cite is misplaced.  That regulation provides, in relevant part, that

> any product containing mercury as a skin bleaching agent and offered for sale as skin-bleaching, beauty, or facial preparation is misbranded within the meaning of sections 502(a), 502(f)(1) and (2), and 502(j), and may be a new drug without approval in violation of section 505 of the Federal Food, Drug, and Cosmetic Act. Any such preparation shipped within the jurisdiction of the Act after January 5, 1973 will be the subject of regulatory action.

21 C.F.R. § 700.13(d)(1) (1987).  The defendants cite no authority, and I have found none, that would require or permit the court to void the registration of a mark on the ground that the product upon which the mark was used *may* contain a substance that *may* subject it to regulatory action.

Second, the defendants point to no evidence in the record that suggests Martal made a material false statement to the PTO when it sought registration of the mark.  Their argument in this regard rests on what they deem to be a discrepancy between a response that Martal made to an interrogatory in this case and a statement included in Martal's trade dress.  In the interrogatory response, Martal denied that the Symba Soap it submitted in connection with its registration application contained mercury.  DX 7 at 13 (response to Interrogatory 33).  An image of the packaging of the soap that Martal submitted with that application includes a statement that the soap contains "1% W/W Mercuric Iodide."  DX 10 (color copy of trade dress).[10]

The discrepancy to which the defendants point is relevant, if at all, not because it shows that the soap contained mercury – that would merely be a repetition of the argument based on the regulation discussed and rejected above – but rather only to the extent that it might show that

---

[10]  I have no idea whether the inclusion of "1% W/W Mercuric Iodide" as an ingredient in a soap product is tantamount to "containing mercury as a skin bleaching agent[.]"  More to the point, the defendants have given me absolutely no reason to think it is.

Martal somehow misled the PTO into believing that it's product did *not* contain mercury.  In that respect, the defendants have failed to demonstrate any factual predicate for their argument.  The denial by Martal that they cite is not a statement to the PTO, but rather a statement made to the defendants in the course of this litigation.  Even assuming that denial to be false, it says nothing about whether Martal acted improperly in seeking and obtaining from the PTO the registration for Symba Soap.  I note in that regard that the regulations on which the defendants seek to rely are silent with respect to whether a petitioner must declare whether its product contains mercury.  Thus, even assuming that the defendants can establish the facts on which they seek to rely, there would be no basis for concluding that the 091 Registration is invalid.

2.    Whether The Seized Goods Were Counterfeit

The New York Defendants having failed to undermine Martal's claim of holding a valid registration for Symba Soap, I next consider whether Martal has established the likelihood of confusion resulting from the defendants' use of the registered mark that is the remaining element of its infringement claim.  There is no factual dispute over whether the products seized from the New York corporate defendants are in appearance substantially similar to genuine Symba products.  Rather, the defendants contest whether the goods that Martal says infringed its trademarks are in fact counterfeit.  I therefore limit my discussion to that question.  *See Danone Asia PTE. Ltd.*, 2006 WL 845573, at *5 (E.D.N.Y. Mar. 29, 2006); *Phillip Morris USA Inc. v. Marlboro Express,* 2005 WL 2076921, *4 (E.D.N.Y. Aug. 26, 2005); *see also Matter of Vuitton et Fils S.A.*, 606 F.2d 1, 4, (2d Cir. 1979) (noting that the "very purpose" of circulating counterfeit products is to "confuse the buying public into believing it is buying the true article"); *Playtex Prod., Inc. v. Georgia-Pacific Corp.*, 390 F.3d 158, 162 (2d Cir. 2004) (citing

*Paddington Corp. v. Attiki Imps. & Distribs., Inc.*, 996 F.2d 577, 584 (2d Cir.1993)) (stating that the Polaroid analysis should not be treated as "mechanical" and that "the courts should focus on "the ultimate question of whether consumers are likely to be confused").

The defendants largely devote their efforts to contesting that the facts on which Martal relies suffice to show that the goods are counterfeit. In that respect, the disagreement at the heart of this motion is not so much about the existence of a material issue of fact as it is about the sufficiency of Martal's proof. Specifically, the defendants contend that Martal has

> failed [to] establish, as a matter of law, that all of the Symba product at issue here is "counterfeit" and is not a prior version of genuine Symba product, or is not a product containing a manufacturing or packaging defect or variance, or not a production headed for a foreign country such as Nigeria and/or is not gray market goods.

NY Opp. at 18-19. Their efforts in this regard appear to be an attempt to cast "metaphysical doubt" on Martal's rather strong evidence with respect to a material fact that is central to its claims – the counterfeit nature of the goods at issue. *Matsushita Elec., Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). As discussed below, they simply fail to meet their burden of establishing a triable issue of fact with respect to the counterfeit nature of the goods.

In support of the claim that the Symba Soap seized "may" be an earlier version of genuine Symba Soap (no such argument is made with respect to Symba Cream), the defendants point to the fact that Martal itself has "never" manufactured any Symba products, but has instead employed subcontractors to do so. NY Opp. at 19. They go on to assert that Martal has "engaged *several* sub-contract manufacturers" to produce Symba products over the years and that, as a result, the Symba trade dress has varied over time. *Id.* (emphasis in original). The argument might have some merit but for two fatal flaws. First, the defendants do not allege –

much less point to supporting evidence – that the use of multiple manufacturers led to any variation that might explain the characteristics of the products about which Martal complains. Second, Martal does not merely cite, as by rights it could, the settled case law that "a party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995) (citations omitted). Martal has instead gone the extra mile and cited evidence that contradicts the defendants' supposition. Specifically, despite any variation in trade dress or subcontractor that occurred throughout the time Martal caused Symba Soap to be produced, Martal produced evidence that, unlike the soap samples seized in 2002, "every version" of genuine Symba Soap has Martal's address on one end of the packaging. *See* Brown Aff. I, Ex. A at 10 (Sarner's response to deposition question 33). Similarly, and again unlike the seized soap samples, all versions of genuine Symba Soap bear a "Made in England" stamp on the rear panel of the packaging, as well as an expiration date. *Id.*

The defendants also seek to deflect the import of Martal's proof by challenging Sarner's ability to distinguish counterfeit from genuine Symba products on the ground that he "may not be physically capable due to infirmity and may not have sufficient knowledge due to lack of involvement in quality control." NY Opp. at 23. Here again, the defendants make two basic errors: they substitute speculation for proof, and they do so with respect to a red herring. Their speculation about Sarner's inability to differentiate his own products from copies – which, as noted above, is the subject of a pending motion for discovery – is supported by no evidence in the record. Moreover, even if Sarner's subjective observations are discounted, the remaining

evidence supporting Martal's claims about the differences between the seized products and genuine Symba products more than suffices to support a finding that the former are counterfeit.

In support of their argument that the allegedly counterfeit Symba Soap "could also" be defective genuine Symba Soap, the defendants submit a letter from Martal's exclusive distributer in Nigeria (from 1995 through 1998) stating that quantities of Symba Soap were found to be defective as a result of "the leakage of excess moisture into the surrounding packaging." DX 61; *see also* DX 62 at 82-83 (transcript of hearing on Order to Show Cause before Judge Gleeson on November 30, 2001) (Kessler's testimony that samples of allegedly counterfeit Symba Soap were faded). Here again, the evidence on which the defendants seek to rely quite obviously does not support their argument. Indeed, they do not even try to explain how the fact that soap distributed in Nigeria in the mid-1990s was damaged by excess moisture might account for the absence, in the seized products, of the "Made in England" stamp, Martal's address, and an expiration date that Martal has demonstrated are present on all genuine Symba Soap products. Nor do the defendants make any effort to explain how such excess moisture, if present, might account for the differences in chemical composition that Martal has demonstrated between the seized and genuine products.

The defendants devote a considerable amount of space in their opposition memorandum to attacking the credibility of Mr. Kessler and his firm's competence in distinguishing between counterfeit and genuine Symba products. *See* NY Opp. at 24-34. They argue that because prior versions of genuine Symba Soap were not provided to the Kessler Firm before it initiated its investigation as a basis for comparison, the determination that the products seized were counterfeit presents a question of fact. *See id*. at 21, 25. Such argument appears to be almost

willfully obtuse. The Kessler Firm made undercover purchases and seizures, but it did not perform any analysis on which Martal now seeks to rely. That analysis was performed by others, and Kessler's incompetence at such a task, even if assumed, would not undermine the results.

Finally, the defendants seek to rely on a grainy black-and-white copy of an advertisement by an authorized distributor of Symba products purporting to feature a picture of Symba Cream as evidence that Martal has previously sold Symba Cream with the same characteristics as the seized products. *See* NY Opp. at 21; DX 60. The image does nothing to advance the defendants' cause: of the various characteristics that Martal asserts distinguish the seized samples from genuine Symba Cream, none is depicted in the advertisement. The advertisement does not display the nozzle of the tube at all, much less in a way that would be amenable to determining whether its diameter is 9 millimeters or 11 millimeters; the image does not suffice to determine how the tube's crimp style or expiration date format compares to either the seized products or genuine Symba Cream; the black-and-white document makes a color comparison impossible; and the image plainly cannot provide any assistance in determining the percentage of hydroquinone in the advertised product – and therefore says nothing about whether the seized samples are counterfeit in that regard as well.

The New York Defendants have failed to submit any evidence that raises any dispute as to a material issue of fact. Martal has adduced sufficient evidence to demonstrate that it obtained from the defendants (by undercover purchase or by court-ordered seizure) counterfeit products nearly identical in appearance to Symba Soap and Symba Cream. *See* Sarner Aff. I ¶¶ 4-5, 16-19; Kessler Aff. I ¶¶ 4-8; Sarner Aff. I, Exs. C-D, F-G. The New York Defendants have focused on irrelevant or immaterial issues that serve only to distract from the key elements of the case.

Though the court must make all inferences from the facts in favor of the party opposing the motion, "a party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995) (quoting *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986)) (internal quotations omitted). After careful review of the parties' voluminous submissions on this motion, I conclude that the evidence on which the New York Defendants seek to rely supports nothing more than "mere speculation and conjecture." *Id.* I therefore conclude that there is no genuine dispute of material fact as to whether the seized goods were counterfeit. The only remaining question with respect to Martal's Lanham Act claims against the corporate New York defendants is thus whether each of the respective entity distributed or sold counterfeit Symba products.

3.  Whether Each Of The New York Corporate Defendants Sold Or Distributed Counterfeit Symba Products

Martal contends that each of the New York-based corporate defendants was involved in the scheme to distribute and sell counterfeit Symba goods. As previously noted, it is undisputed that counterfeit goods were purchased from KAK, Homeboy's, and IBE-NY; the liability of these entities is thus plainly established. With respect to ICE, Martal contends that the Aini brothers essentially operated that business and IBE-NY as a single entity from the Maspeth location, where each of the three brothers works and each company is based. *See* Martal Stmt. I ¶ 63; Martal Memo. at 37-39. Moreover, Martal notes that records seized from the Maspeth warehouse document considerable sales of Symba Soap and Symba Cream from ICE to IBE-NY, some of which, owing to the timing and volume of the sales, were necessarily counterfeit. *See* Martal Memo. at 37 (citing PX 19; PX 4A; PX4B) (summary of seized invoices and two volumes

of copies of seized invoices, respectively). The records at issue document that in 2000 ICE sold IBE-NY 7,876 bars of Symba Soap and 4,896 tubes of Symba Cream, and that in 2001 ICE sold IBE-NY 9,252 bars of Symba Soap and 7,200 tubes of Symba Cream. *See* PX 19 at 6-7, 10-12; PX 4A; PX 4B.[11]

The New York Defendants argue that Martal has failed to establish that ICE ever sold IBE-NY or any other individual or entity any counterfeit Symba products. Their position is simply untenable. As noted, unquestionably counterfeit Symba goods were seized from the Maspeth location on three separate occasions. Records seized from ICE demonstrate that it continued to sell substantial quantities of Symba Cream and Symba Soap well after Martal had ceased supplying it with genuine products, after the Preliminary Injunction against its use of the Symba mark was issued, and after counterfeit goods had been seized from the warehouse it shares with IBE-NY. In light of this undisputed evidence, it is inconceivable that all of the Symba Cream and Symba Soap ICE sold after 1998 was genuine, and that ICE was not aware of the possibility that it was selling counterfeit products.

Moreover, Martal has submitted evidence that ICE was the recipient of at least one specific shipment of counterfeit goods. Jacob Aini, who was present at the November 2001 seizure, testified that the seized counterfeit goods had been purchased from IBE-FL, which in turn had purchased them from an entity known as Carib. *See* J. Aini Dep. at 106-110. The

---

[11] The records at issue identify the buyer for these respective sales as "Harry." The New York Defendants have never disputed Martal's claim that "Harry" refers to Harry Aini, acting on behalf of IBE-NY. *See* Pl. Stmt. I ¶ 65. In light of the close relationship between the individuals and entities involved, I note that this is undisputed assertion is also a reasonable one. Moreover, I note that Jacob Aini testified that Harry Aini was the sole individual who could purchase goods on behalf of IBE-NY. *See* J. Aini Dep. at 226.

records documenting this transaction demonstrate that Carib sold the Symba Cream at issue to IBE-FL on January 20, 2000, that IBE-FL thereafter shipped these goods to ICE, and that IBE-NY ultimately paid IBE-FL for the shipment in question. *See* PX 18 (consisting of check from IBE-NY to IBE-FL dated January 27, 2000 for $3,240, invoice dated January 20, 2000 recording the sale of 360 dozen tubes of 2.0 ounce Symba cream; and a bill of lading dated January 24, 2000, recording the shipment of "1 pallet toilet prep. 30 cts" from IBE-FL to ICE). The New York defendants claim that the bill of lading is incorrect and the shipment was actually made to IBE-NY; this bald assertion is insufficient to raise a question of fact with respect to ICE's role in the distribution and sale of the counterfeit goods in light of the other evidence. In short, the record amply demonstrates that each of the many corporate guises in which the Ainis have clothed themselves bears responsibility for trafficking in counterfeit Symba products.

B.     Martal's State Law Claims Against The New York Corporate Defendants

In addition to its federal claims under the Lanham Act, Martal also asserts state law claims for unfair competition and injury to its business reputation based on the same conduct by the New York corporate defendants that Martal alleges in support of its federal claims. The elements of these state law claims are substantially similar to those of Martal's federal claims. Essentially, the New York law of unfair competition requires that Martal demonstrate a likelihood of confusion resulting from "the bad faith misappropriation of the labors and expenditures of another." *Jeffrey Milstein v. Greger, Lawlor, Roth, Inc.*, 58 F.3d 27, 34 (2d Cir. 1995) (internal quotation marks omitted); *see also Bangkok Crafts Corp. v. Capitolo di San Pietro in Vaticano*, 331 F. Supp.2d 247, 255 (S.D.N.Y. 2004) (noting that the relevant standard under New York law "is a virtual cognate of the federal Lanham Act"). In concluding that Martal

36

should prevail against the New York corporate defendants on its Lanham Act claims, I necessarily conclude that Martal should also prevail on its state law claims for unfair competition. I therefore recommend granting summary judgment on Martal's state law claims against the New York corporate defendants as well.

C.    Martal's Claims Against Individual New York Defendants

1.    The Applicable Legal Standard

The New York Defendants contend that Martal has not submitted any evidence that demonstrates that Harry Aini, Jacob Aini, or Michael Aini was a "moving active conscious force behind" the New York corporate defendants' infringing conduct, and that those individuals should therefore not be held personally liable. NY Opp. at 35-36. Aside from raising this issue, however, the defendants do not point to any evidence that, contrasted with Martal's evidence on the point, raises any genuine dispute of material fact. For the reasons explained below, I recommend holding Harry and Michael Aini personally liable for infringing Martal's Symba trademark but conclude that the current record is insufficient to warrant a similar recommendation as to Jacob Aini.

Individual defendants can be held personally liable "for trademark infringement and unfair competition ... if the officer is a 'moving, active conscious force behind [the defendant corporation's] infringement.'" *Bambu Sales, Inc. v. Sultana Crackers*, 683 F. Supp. 899, 913 (E.D.N.Y. 1988) (quoting *Polo Fashions, Inc. v. Branded Apparel Merch.*, 592 F. Supp. 648 (D. Mass. 1984)). Demonstrating that the corporation's officer "authorized and approved the acts of unfair competition which are the basis of the corporation's liability is sufficient to subject the officer to personal liability." *Id.* at 913 (internal punctuation and quotation marks omitted); *see*

*also Cartier, a Div. of Richemont N. Am., Inc. v. Samo's Sons, Inc.*, 2005 WL 2560382, at *10 (S.D.N.Y. Oct. 11, 2005) (finding individual defendant officer personally liable on trademark infringement claims on the basis of his responsibility for making purchasing decisions). Moreover, a defendant's belief that the products at issue were genuine and non-infringing is "irrelevant" to the disposition of a Lanham Act claim for trademark infringement. *Gucci Am., Inc. v. Action Activewear, Inc.,* 759 F. Supp. 1060, 1065 (S.D.N.Y. 1991) (stating that "[i]t is well settled that wrongful intent is not a prerequisite to an action for trademark infringement or unfair competition, and that good faith is no defense"). With these legal principles in mind, I examine the state of the evidence as to each individual defendant.

2.      Harry Aini

Harry Aini is the President and sole shareholder of IBE-NY and Homeboys and was the sole individual with the authority to write checks on behalf of IBE-NY. *See* Pl. Stmt. I ¶ 65; *see also* PX 43 at 25-28; PX 20 (check signed by Harry Aini for Symba Cream). As noted, numerous invoices seized from the Maspeth New York location indicate that ICE sold Symba products to a "Harry" listed as a customer, apparently purchasing them for IBE-NY. *See* PX 4A; PX 4B; J. Aini Dep. at 226; PX 19 (summary of IBE-NY sales). The evidence is sufficient to support an inference that Harry Aini was a "moving, active conscious force behind the defendant corporation's infringement," *Bambu Sales, Inc.*, 683 F. Supp. at 913, and the defendants offer no countervailing evidence that they claim creates a genuine dispute of fact on this score. Accordingly, I recommend granting Martal summary judgment against Harry Aini for his role in infringing Martal's Symba trademarks.

3.     <u>Michael Aini</u>

Michael Aini is the owner, sole shareholder, and sole employee of ICE, and a fifty percent shareholder in IBE-FL.  *See* Martal Stmt. I ¶ 66.  He is involved in the importation, manufacturing, and sale of beauty products and, according to his brother Jacob, he worked out of ICE's offices at the Maspeth location "five days a week."  *See* J. Aini Dep. at 78.  Moreover, it appears that he also acted on behalf of IBE-NY.  M.C.A. Medical and Chemical Agency S.p.A. ("MCA") sent a letter to the attention of both Michael Aini and Jacob Aini at IBE-NY that discussed whether their company was "still interested in a new Contract Agreement," thus indicating that the two were perceived to have the authority to bind IBE-NY.  Most significantly, Michael Aini was personally responsible for all of ICE's sales, including those that post-dated the three seizures of counterfeit goods from the Maspeth location.  *See* J. Aini Dep. at 167-168; PX4A; PX4B (invoices).  The evidence is sufficient to support an inference that Michael Aini was a "moving, active conscious force behind" ICE's infringing conduct.  *Bambu Sales, Inc.*, 683 F. Supp. at 913, and the defendants offer no countervailing evidence that they claim creates a genuine dispute of fact on this score.  Accordingly, I recommend granting Martal summary judgment against Michael Aini for his role in infringing Martal's Symba trademarks.

4.     <u>Jacob Aini</u>

Martal has introduced substantial evidence demonstrating Jacob Aini's knowledge of and involvement in the various entities owned by his brother, which, Martal argues, compels the conclusion that he was an active force in the corporate defendants' infringing conduct.  *See* Martal Memo. at 38-42.  This evidence suggests that Jacob Aini acted as a consultant to the corporate defendants for the sale and distribution of beauty products, including Symba products.

39

*See* J. Aini Dep. at 44-48, 53-54, 62, 124-126.  In this capacity, he worked from the Maspeth

location several days a week during the time period relevant to the instant suit.  Pl. Stmt. I ¶ 68.

As substantial as his involvement may have been with his brothers' business, I find that Martal

has failed to introduce evidence that Jacob Aini was substantially involved in their activities with

respect to counterfeit Symba products.  For example, while Martal notes that Jacob Aini was

sometimes paid a commission for his work with ICE, it has introduced no evidence that he

received such a payment in connection with the sale or distribution of Symba products – let alone

the counterfeit products.   The other evidence to which Martal points is largely irrelevant.  For

example, Martal notes that Jacob Aini was the individual who informed Sarner that there was

counterfeit Symba products in the marketplace in 1999 and that he was present during the

November 2001 seizure of the suspect Symba products at the Maspeth New York location, but

neither of these facts directly link Jacob Aini to the counterfeit goods sufficiently to warrant

summary judgment.  Accordingly, I recommend denying Martal summary judgment against

Jacob Aini.

     D.     <u>The New York Defendants' Affirmative Defenses and Counterclaims</u>

As Martal has established all the elements of its infringement claims against the New

York Defendants (other than Jacob Aini), the next question is whether the New York Defendants

have asserted a valid defense that precludes summary judgment in Martal's favor.[12]  Moreover,

although Martal only moves for summary judgment with respect to its claims against the New

---

[12]  As explained above in section A.2.a, Martal *has* established ownership of the Symba Cream
trademark for purposes of making out a *prima facie* claim under the Lanham Act, but the New
York Defendants have raised a question of fact that allows their affirmative defense of invalidity
to go forward.

York Defendants, it seeks summary judgment in its favor with respect to the affirmative defenses and counterclaims raised by all of the defendants.

At least some of their affirmative defenses have been waived.[13]  With respect to the New York Defendants, many of the others are necessarily insufficient in light of the preceding analysis of Martal's motion for summary judgment for reasons discussed above.[14]  Of those that are not necessarily disposed of by virtue of the preceding analysis, none has merit sufficient to defeat Martal's motion for summary judgment, as explained below (other than the affirmative defense of trademark invalidity as to Symba Cream, for reasons already discussed).  With respect to the Florida Defendants, several of the affirmative defenses at issue concern the sufficiency of Martal's infringement claims against them and whether there are triable issues of fact with respect to their liability.[15]  I address these issues in the next section where I discuss the Florida

_____

[13]  The Florida Defendants' second and third affirmative defenses – lack of personal jurisdiction and lack of venue, respectively – have long since been waived pursuant to Federal Rule of Civil Procedure 12(h)(1)(A).  In any event, the record is replete with contacts between the Florida Defendants and this district that would suffice to over come both defenses.

[14]  Specifically, if the preceding analysis of the record is correct, the New York Defendants could not establish their affirmative defense of failure to state a claim (first affirmative defense), the assertion that they did not distribute counterfeit Symba products (second affirmative defense), the assertion that the Symba goods the defendants distributed were genuine (fourth and eighth affirmative defenses), the assertion that they were innocent infringers (fifth affirmative defense), and, with respect to Symba Soap, their assertion that the trademarks at issue are invalid due to Martal's fraud on the PTO (eleventh affirmative defense).  *See* NY Answer at 8.  The preceding analysis does not compel the same conclusion with respect to the New York Defendants' third affirmative defense, which asserts on behalf of Rachel and Jacob Aini only that they did not distribute counterfeit Symba goods.  Consistent with my analysis of the record regarding Jacob Aini's participation in the infringing conduct, I conclude that there exists a sufficient question of fact on this score to preclude summary judgment in Martal's favor with respect to this affirmative defense.

[15]  For example, the Florida Defendants claim that Martal has failed to state a claim (their first affirmative defense), that the products at issue were not counterfeit, but were instead genuine and

Defendants' cross-motion for summary judgment in their favor on all of Martal's claims. The remainder of this discussion concerns those affirmative defenses and counter-claims common to all of the defendants. As explained below, they are almost entirely without merit.

1.    Laches And Acquiescence

The defendants claim that Martal's request for injunctive relief is barred by the "doctrine of laches, acquiescence or abandonment." NY Answer at 11 (twelfth affirmative defense); FL Answer at 10 (thirteenth affirmative defense); NY Opp. at 52; FL Opp. at 6. Specifically, they claim that after being provided with samples of counterfeit product in November 1997, Martal waited until May 1999, "nearly two (2) years," to begin an investigation. NY Opp. at 52; FL Opp. at 7. The defendants argue that the length of the delay raises a factual issue affecting Martal's claim of irreparable harm. *Id*. Martal argues that there was no delay, averring that its investigators only "tied" the defendants to the counterfeit Symba goods in or about mid-1999 and thereafter conducted an extensive investigation before Martal ultimately filed suit on November 15, 2001. Martal Memo. at 51.

To establish a defense of laches, the defendants must demonstrate that Martal "'had knowledge of defendants' use of its marks, that plaintiff inexcusably delayed in taking action with respect thereto, and that defendants will be prejudiced by permitting plaintiffs inequitably to assert their rights at this time.'" *Citibank, N.A. v. Citytrust*, 644 F. Supp. 1011, 1012 (E.D.N.Y. 1986) (quoting *Cuban Cigar Brands, N.V. v. Upmann Int'l*, Inc., 457 F. Supp. 1090, 1096 (S.D.N.Y. 1978), *aff'd*, 607 F.2d 995 (2d Cir. 1979)); *see also King v. Innovation Books*, 976

---

contained a defect (their fourth, fifth and ninth affirmative defenses), and that any infringement was innocent (sixth affirmative defense).

F.2d 824, 832 (2d Cir. 1992) (party asserting laches defense must show that the delay was unreasonable and that it was prejudiced as a result). Establishing the defense of acquiescence requires the defendants to "prove conduct on the plaintiffs' part that amounted to an assurance to the defendants, express or implied, that the plaintiffs would not assert their trademark rights against defendants." *Id.* (citations and internal quotation marks omitted).

Despite the defendants' assertion otherwise, there is no dispute of fact warranting the denial of Martal's motion or, as discussed below, its request for injunctive relief. Martal does not dispute that the defendants' forwarded samples of allegedly counterfeit Symba goods in 1997; it simply states that it did not become concerned about counterfeiting until its sales dropped in 1999 and that it did not suspect the defendants were involved until mid-1999. *See* DX 7 at 50, 60 (Sarner's responses to deposition questions acknowledging that the defendants forwarded product samples in 1997); Sarner Aff. I ¶ 11. Thereafter, the record is replete with evidence of Martal's diligence in investigating the extent of the defendants' involvement in the distribution of counterfeit Symba goods. *See e.g.* Kessler Aff. I; *supra* Section I.E. The defendants provide no evidence, and I have found none in the record, that raises a question that Martal "had knowledge" prior to mid-1999 that the defendants might be infringing upon its Symba mark. *See Citibank, N.A.*, 644 F. Supp. at 1012. Nor do the defendants provide evidence, or even argue, that they were prejudiced by the alleged delay. Similarly, the defendants point to no evidence that Martal either gave them an assurance that it would take no action regarding their use of the Symba mark (assuming it knew they were distributing counterfeit Symba products) or indicate in any way that it had abandoned the relevant marks. *See id.* As a result, I recommend granting summary

judgment in favor of Martal on the New York Defendants' twelfth affirmative defense and the Florida Defendants' thirteenth affirmative defense.

2.   Bad Faith

The defendants claim that "there are numerous factual issues which remain" concerning the manner in which Martal sought and executed the court's two seizure orders.  NY Opp. at 53-54.  Specifically, the defendants assert that Martal sought the orders in "bad faith" and that as such, its use "constitutes a wrongful seizure and malicious prosecution."  NY Opp. at 53; FL Opp. at 7-8.  Additionally, the defendants allege that Martal exceeded the scope of the seizure orders by confiscating "confidential business records, customer lists, computers, hard drives, bank statements, address books, numerous business files, and other materials."  NY. Opp. at 53.  They claim that such excess constitutes an abuse of process.  Martal argues that it conformed to the parameters contained in the seizure orders and its actions were therefore proper.  Martal Memo. at 54.

As a threshold matter, the Florida Defendants' point to no evidence in the record, and I have discovered none, suggesting that they were ever subject to a seizure in this matter.  Thus, to the extent that there might be any defense regarding Martal's actions in obtaining and executing the seizure orders, the Florida Defendants lack standing to assert it.

The New York Defendants' make their argument by asserting that the "[p]laintiff has not presented any evidence to negate these affirmative defenses or the NY Defendants's [sic] counterclaims that the Seizure Order and Additional Seizure Order were wrongfully carried out beyond the scope of the Court's Orders in disregard for the explicit provisions."  NY Opp. at 53.  By so arguing, the defendants seek to place the burden on Martal to establish, in contravention of

the defendants' affirmative defenses and counterclaims, that it acted in good faith in seeking and executing the seizure orders.

In the context of summary judgment "the burden on the moving party will be 'discharged by showing – that is, pointing out to the District Court – that there is an absence of evidence to support the non-moving party's case.'" *Kredietbank, N.V. v. Svirsky*, 1991 WL 177652, at *3 (S.D.N.Y. Sept. 5, 1991) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). Thus, where the resolution of a claim requires the movant to prove a negative fact, the burden shifts to the non-movant. Having demonstrated that it is entitled to partial summary judgment on the merits of its own claims, Martal need not go further and demonstrate that it will necessarily prevail on the defendants' affirmative defenses and counterclaims; rather, the burden shifts to the defendants to demonstrate that the record would suffice for them to establish those affirmative assertions of Martal's bad faith. This they do not, and apparently cannot, do. Instead, they rely on conclusory allegations and assert – contrary to the law, which they do not cite – that Martal "should be required to prove the absence of these facts." NY Opp. at 54; FL Opp. at 8. Accordingly, I recommend dismissing the New York Defendants' fourteenth and fifteenth affirmative defenses and all of the defendants' counterclaims, each of which relies on allegations of such bad faith.

3.     Trademark-Related Affirmative Defenses

The New York Defendants' eleventh affirmative defense and the Florida's Defendants' twelfth affirmative defense allege that the trademarks at issue are invalid due to Martal's fraud on the PTO. *See* NY Answer at 10-11; FL Answer at 10. As discussed, the defendants failed to raise a question of fact as to the validity of the 091 Registration covering Symba Soap, although

they have done so with respect to the 368 Registration covering Symba Cream. I therefore recommend that the court dismiss these affirmative defenses with respect to the 091 Registration, but not with respect the 368 Registration. The latter recommendation is the *only* barrier that I conclude should separate Martal from winning judgment entirely in its favor on the claims in its Complaint (as to the New York Defendants other than Jacob Aini).

The New York Defendants' sixth affirmative defense and the Florida Defendants' seventh and tenth affirmative defenses assert that Martal's claims are barred by the doctrine of territoriality of trademarks. NY Answer at 9; FL Answer at 9-10.[16] Although the defendants have not included in their motion papers any argument in support of this affirmative defense, Martal has helpfully alerted me to an argument on the subject that the defendants did make earlier in this litigation; specifically, the defendants apparently took the position that they are free to distribute Symba products manufactured by foreign companies that own the mark in their respective countries, and they produced an alleged trademark registration for Symba in the Republic of China held by a company called "Jen-Na." *See* Martal Memo. at 46 (citing Defendants' Memorandum In Support of Motion to Vacate); *see also* PX 28 (Chinese trademark register for "Symba MT" assigned to Chen-Na and English translation of same).

---

[16] The defendants have made no argument in opposition to Martal's motion for summary judgment on the affirmative discussed in this subsection, stating that "in lieu of addressing each and every affirmative defense and rebutting each and every frivolous argument made by Plaintiff and making this memorandum longer than it already is, the [defendants] shall only address those affirmative defenses where it is (or should be) clear that a genuine issue of material fact exists." NY Opp. at 49; FL Opp. at 3. By implication from this statement and the fact that the defendants' did not oppose Martal's arguments, I must assume that the defendants concede that it is "clear" that there are no factual disputes regarding these defenses. Therefore, for the reasons discussed below, I recommend granting summary judgment in Martal's favor and dismissing each of the affirmative defenses discussed in this section as a matter of law.

Assuming that the defendants can be considered to have advanced the argument for purposes of opposing summary judgment, which is doubtful, it rests on insufficient proof: the record contains no evidence that authenticates the Chinese registration, and it also contains no evidence that the defendants actually purchased or sold any products that Jen-Na (or Chen-Na) manufactured. *See* Martal Memo. at 46. Even without those flaws – and it is hardly surprising that the defendants did not introduce evidence to support an argument they did not make – the argument would fail as a matter of law. The Supreme Court has long since "recogniz[ed] that a trademark has a separate legal existence in each country" and that "the owner of the mark may be confident that his goodwill and reputation (the value of the mark) will not be injured through use of the mark by others in domestic commerce." *Bambu Sales, Inc. v. Sultana Crackers, Inc.*, 683 F. Supp. 899, 910 (E.D.N.Y. 1988) (citing *A. Bourjois & Co., Inc. v. Katzel*, 260 U.S. 689, 691 (1923)). A defendant may not argue that it is immune from prosecution for violations of the Lanham Act on the ground that it distributed goods with a mark lawfully registered in another country.

The New York Defendants' seventh, ninth, and tenth affirmative defenses and the Florida Defendants' eighth and eleventh affirmative defenses all appear to raise a *jus tertii* defense – that is, they all assert in one way or another that Martal's claims are barred because another entity may have superior rights to the Symba mark. NY Answer at 9-10; FL Answer at 9-10. Such a defense has been flatly rejected in trademark cases. *Project Strategies Corp. v. Nat'l Commc'ns Corp.*, 948 F. Supp. 218, 225 (E.D.N.Y.,1996); *Bambu Sales, Inc.*, 683 F. Supp. at 909 (stating that by allowing such a defense "a defendant could effectively divert attention from its own alleged infringement and become a vicarious avenger of another's purported rights against itself") (citing

47

2 J. McCarthy, *Trademarks and Unfair Competition*, at 675). As discussed above, Martal has successfully demonstrated that it is the owner of the Symba mark, a federally registered trademark, at least with respect to one of the products at issue – Symba Soap. Moreover, the defendants have adduced no evidence that Martal misappropriated the mark from any other entity.

Finally, the New York Defendants' thirteenth affirmative defense and the Florida Defendants' fourteenth affirmative defense state that Martal's claims are barred "on the grounds of improper or illegal use of trademarks and/or use of trademarks designed to achieve anti-competitive results or to violate the antitrust laws of the State of New York and/or the United States." NY Answer at 11; FL Answer at 11. They offer no argument to explain how that theory of defense is meritorious or why the record supports it as a basis for denying Martal's motion for summery judgment. Although they are entitled to no such advantage, in the interest of resolving this case fairly on the merits I have tried to interpret the defendants' papers in this regard as liberally as I would those of a *pro se* litigant. The best I can manage in that regard is to infer that the defendants are claiming that Martal's infringement claim itself constitutes a violation of the antitrust laws. I cannot imagine how that might be the case, and I should not have to. If that is the defendants' argument, it fails for the same reason that their claim of Martal's bad faith does not suffice to withstand summary judgment: they have done nothing to support the affirmative defense as a matter of fact or of law. *See Original Appalachian Artworks, Inc. v. Granada Electronics, Inc.*, 816 F.2d 68, 74 (2d Cir. 1987) (finding that dismissal of a defense alleging that an infringement suit violated antitrust laws was proper where "no evidence that the suit was brought in bad faith, to harass, or in any way such that it would not be immune from antitrust

strictures under the *Noerr-Pennington* doctrine") (citing *W. Goebel Porzellanfabrik v. Action Indus., Inc.*, 589 F. Supp. 763, 767 (S.D.N.Y. 1984)).

For all of the reasons set forth above, with the exception of their third affirmative defense that concerns only the personal liability of Jacob and Rachel Aini and their fifth affirmative defense concerning the validity of the 368 Registration, the New York Defendants have failed to develop a record that would allow their affirmative defenses or counterclaims to stand as a basis for denying judgment to Martal on its claims. I therefore recommend granting partial summary judgment in favor of Martal and dismissing all of the New York Defendants' other affirmative defenses and counterclaims. Likewise, the preceding discussion established that the Florida Defendants' second, third, seventh, eighth, tenth, eleventh, thirteenth, and fourteenth affirmative defenses as well as both of their counterclaims cannot prevent judgment in Martal's favor with respect to its claims. I therefore recommend granting summary judgment in Martal's favor with respect to these affirmative defenses and counterclaims.

E.      The Defendants' Motions To Amend The Answer And to Compel Further Discovery Are No Bar To Partial Summary Judgment In Favor Of Martal, But The Defendants Are Entitled To Further Depose Sarner With Respect To The Application For The 368 Registration

As discussed at the outset, there are several pending pretrial motions that in theory could affect determination of the motions for summary judgment: the defendants' motion to amend the answer, the defendants' joint motion for leave to take discovery regarding Sarner's use of a visual magnification device, the defendants' joint motion to compel the deposition of Susan Peterson, and the New York Defendants' motion to take the telephonic deposition of Roger Bundhoo. I address each in turn.

1.      The Motion To Amend

As a threshold matter, when the defendants' first presented their motion to amend to Judge Chrein, they were instructed to direct the motion to Judge Gleeson, the assigned district judge at the time, "who may or may not refer [the matter]" for a report and recommendation. *See* DE 237 (letter from Judge Chrein dated October 16, 2003). I have found no indication in the record that the defendants have done so, nor any order referring the matter to the assigned magistrate judge.

Setting aside any possibility that the motion to amend should be denied as untimely, it is also procedurally defective and futile. The defendants' motion did not include the proposed amendment to their answer. Its failure in this regard suffices to deny the instant motion. *See e.g., AT&T Corp. v. Am. Cash Card Corp.,* 184 F.R.D. 515, 521 (S.D.N.Y. 1999) ("[T]he proposed amended pleading must accompany the motion, so that both the Court and opposing parties can understand the exact changes sought.") (citing *Smith v. Planas,* 151 F.R.D. 547, 550 (S.D.N.Y. 1993); *Jacobsen v. Peat, Marwick, Mitchell & Co.,* 445 F. Supp. 518, 526 (S.D.N.Y. 1977). However, because it is clear that the defendants' motion is futile in addition to being procedurally defective, I will address the merits rather than recommend that the court hold it in abeyance or deny it without prejudice to amendment, as is the usual practice where a party fails to include the proposed amendment with its motion. *See AT&T Corp.,* 184 F.R.D. at 521 (quoting *Planas,* 151 F.R.D. at 550).

The defendants seek to add a counterclaim and defense pursuant to 15 U.S.C. §§ 1119 and 1120 for cancellation of Martal's trademark registration of Symba Soap and cream. *See* DE 236 at 1. With respect to Symba Soap, Martal was required to prove that it was the owner of

registered trademarks in order to prevail on its claim under § 1114 of the Lanham Act, and the

defendants have already had an opportunity to develop the factual record on that issue. With

respect to Symba Cream, although, based on the record before me, I find that there is a question

of fact as to the validity of the relevant registration protecting this mark, even if the mark is

ultimately found to be invalid, none of the defendants would be entitled to relief under 15 U.S.C.

§ 1119 or § 1120.

Section 1119 does not provide a cause of action; it merely establishes the court's power to

resolve questions of validity that arise in "any action involving a registered mark." 15 U.S.C.

§ 1119. Section 1120 creates a cause of action for one injured by the fraudulent procurement of a

trademark registration:

> Any person who shall procure a registration in the Patent and Trademark Office of
> a mark by a false or fraudulent declaration or representation, oral or in writing, or
> by any false means, shall be liable in a civil action by any person injured thereby
> for any damages sustained in consequence thereof.

Relief under § 1120 requires that the parties' injuries "result from the use of the mark while

falsely registered." *D.M. & Antique Import Corp. v. Royal Saxe Corp.,* 311 F. Supp. 1261, 1272

(S.D.N.Y. 1970) (quoting *Landstrom v. Thrope*, 189 F.2d 46, 50 (8th Cir. 1951); *see also*

*Berliner v. Recordcraft Sales Corp.*, 1987 WL 5805, at *8 (S.D.N.Y. Jan. 15, 1987) (stating that

"a petitioner for cancellation 'must show a real and rational basis for his belief that he would be

damaged by the registration sought to be cancelled, stemming from an actual commercial or

pecuniary interest in his own work'") (quoting *Star-Kist Foods, Inc. v. P.J. Rhodes & Co.*, 735

F.2d 346, 349 (9th Cir. 1984)).

The defendants' motion papers never address what damages the defendants claim to have suffered as a direct result of Martal's alleged fraudulent procurement of the 368 Registration that warrant recovery under § 1120. The only conceivable injury the defendants could claim is that they have been sued over their alleged involvement with the counterfeiting of Symba products, and thus that they have been damaged in the amount of their legal fees and costs. This is simply not a cognizable injury for purposes of § 1120. *See Blue Bell, Inc. v. Jaymar-Ruby Inc.*, 497 F.2d 433, 439 (noting that absent exceptional circumstances such as "an absolutely false registration ... obtained solely for the purpose of instituting completely vexatious litigation," defensive expenses should not be awarded under § 1120); *Havana Club Holding, S.A. v. Galleon*, 1998 WL 150983, *2 (S.D.N.Y. 1998).

2.     The Motion For Discovery Regarding Sarner's Vision

The defendants' motion for leave to take discovery regarding Sarner's use of a "magnification device" to identify the differences between genuine and counterfeit Symba soap is no bar to Martal's motion for summary judgment. In any event, I deny it, for the reasons set forth below.

In a supplemental affidavit dated February 19, 2004 Sarner acknowledged that, in examining the suspected counterfeit samples and noting several of the ways in which they differed from genuine Symba products, he required the "assistance of a Closed Circuit Television magnification device, or spectacles with lens of 8X magnification or other high magnification visual aid." FL Compel Br. Ex. A (Affidavit of Marcus Sarner) ¶ 2. The Florida and New York Defendants argue that this acknowledgment of the need for such assistance "raises important new issues." *Id.* at 3; NY Compel Br. at 3 (New York Defendants' Memorandum of Law). The New

York Defendants go on to assert, using an adverb that is likely more apt than they intend, that "[u]nbelievably," Sarner's statement in 2004 was "the very first time" that he openly acknowledged his need for such visual aids, and that as a result they should be granted an opportunity to take discovery on the matter. NY Compel Br. at 3.

The defendants' assertion that Sarner's statement in 2004 was their first notice of the issue is indeed unbelievable. As Martal points out, the statement was at least the fifth time the defendants were confronted with information about Sarner's visual impairment. *See* Martal Discovery Br. at 5 n.2 (listing each instance). In one such instance, during an October 28, 2002, conference regarding the defendants' motion to depose Sarner in person, Martal's counsel stated that Sarner was "legally blind," and later noted that "his wife reads papers to him." DE 135 (transcript of proceeding) at 2, 6. At the time of that conference, discovery was scheduled to end on December 13, 2002. *See* DE 34. Nevertheless, the defendants waited until well after that discovery deadline, and until after all of the respective summary judgments were fully briefed to seize on a document restating what they already knew to claim that they must have this additional discovery about Sarner's vision problem. I therefore deny the defendants' motion as untimely. As a result, it is no bar to consideration of Martal's motion for summary judgment.

Even if the motion had some merit, it would not suffice to stave off judgment in Martal's favor because the discovery the defendants seek could not create a genuine dispute as to any material issue of fact. Sarner's vision is relevant to his ability to compare certain characteristics of the suspect samples with the corresponding characteristics of Symba Soap and Symba Cream. But some of the evidence on which Martal relies to demonstrate that the suspect samples were counterfeit is based on chemical analysis, and is entirely unaffected by any problems with

Sarner's sight. Moreover, to the extent Martal relies on the fruits of Sarner's visual inspections, it relies on the facts that Sarner discovered, not on the fact that Sarner was uniquely qualified to discover them. If Sarner made a mistake in comparing the physical attributes of seized samples with the corresponding attributes of known genuine products, then the defendants are unquestionably in a position to point them out. There is thus nothing that further inquiry into Sarner's visual activity could produce that would undermine Martal's right to secure summary judgment in its favor on the basis of the current record.

      3.    <u>The Motions To Depose Sarner About The 368 Registration Application</u>

The Florida Defendants and the ICE Defendants claim one other ground for taking the oral deposition of Sarner: his July 2003 responses to deposition questions in which, as previously discussed, he noted that two of the goods claimed in the 368 Registration had not been used in commerce as of the effective date of the application. *See* FL Compel Br. at 6-7; NY Compel Br. at 3 (adopting on behalf of the ICE Defendants only the Florida Defendants' arguments). Sarner's knowledge of this fact at the time he filed the application for the 368 Registration is plainly relevant to resolution of the various summary judgment motions before the court. If he knew that certain of the goods listed in the application were not in commerce when he signed the application on behalf of Martal, this could serve as a basis for finding the 368 Registration void *ab initio* and terminate entirely Martal's rights with respect to it. Accordingly, I grant the defendants' motion to take further discovery of Sarner for the limited purpose of asking him about his knowledge and awareness with respect to those goods listed in the 368 Registration. I direct the parties to complete that deposition by October 23, 2006.

4.    The Motions To Depose Susan Peterson And Roger Bundhoo

Susan Peterson is an investigator with the Kessler Firm who made undercover purchases of Symba products.  The defendants seek to take her deposition simply because she participated in some of the undercover purchases and she has "relevant knowledge" concerning the Kessler Firm's investigation.  *See* Def. Compel Br. at 1.  The discovery the defendants seek would do nothing to undermine Martal's motion for summary judgment.  The defendants have extensively deposed Mr. Kessler, among other witnesses, and they have submitted nothing that suggests any reason to think that Peterson's testimony would in any way contradict or undermine the information about the investigation already before the court.  Moreover, as previously discussed, the quality of the investigation is not material to a determination of Martal's infringement claims.

As for the New York Defendants' motion to take the telephonic deposition of Roger Bundhoo, the parties are in agreement that the motion need not be decided in advance of a disposition of the motions for summary judgment.  *See* DE 320, 321, 326.  Notwithstanding that invitation to punt, I see no need for further delay, and instead deny the motion.  The defendants seek to depose Bundhoo regarding "MB Products['] occupancy of [the Maspeth location] and ownership of" the goods seized from that location.  *See* DE 198.  There is no need for such testimony, as Judge Chrein has already made a  determination that ICE and IBE-NY occupied the premises at issue and the seized goods.  *See* DE 88 at 10-12.

For the reasons stated above, I grant the defendants' motion to take further discovery of Sarner for the sole and limited purpose of questioning him about which goods listed in the 368 Registration application were in commerce as of the date he signed it, and his knowledge of the same at the time he filed the application.  I note that granting this motion does not preclude the

grant of partial summary judgment that I recommend.  I deny the balance of the motions without prejudice to renewal in the event the court rejects the instant recommendations.

       F.      <u>Conclusion As To Martal's Motion For Summary Judgment</u>

For the reasons explained above, I recommend that the court grant partial summary judgment against the corporate New York Defendants on Martal's Lanham Act claims; specifically, that it grant Martal summary judgment with respect to infringement of the 091 Registration covering Symba Soap.  I further note that the above discussion establishes that the only issue of material fact with respect to the New York corporate defendants' infringement of the 368 Registration applicable to Symba Soap is whether the registration is in fact valid.  To the extent that Martal prevails on this score, it is entitled to judgment in its favor as there is no question that the defendants at issue used counterfeit Symba Cream in commerce.

IV.      <u>The Defendants' Motions For Summary Judgment</u>

       A.      <u>The Florida Defendants</u>

The Florida Defendants' move for summary judgment on essentially two grounds:  that Martal has failed to present "any evidence" that they "ever manufactured, imported, purchased, transferred, sold, distributed or otherwise used in commerce a single piece of counterfeit Symba products" and that Martal has failed to prove that Horowitz was "a moving active conscious force" behind any of the corporate defendant's alleged infringement.  FL Memo. at 8-9, 12-13. Martal counters that there is ample evidence in the record that IBE-FL supplied IBE-NY and ICE with counterfeit Symba products, and that Horowitz personally oversaw these transactions. Martal FL Opp. at 6-9.  Martal further argues that there is substantial evidence that IBE-FL and the New York Defendants "operated as a single entity in the distribution, sale and offer to sell

counterfeit Symba products." *Id.* at 10-15. I agree, and find that this evidence raises sufficient questions of fact as to each of the Florida Defendants' liability to defeat their cross-motion for summary judgment.

There is ample evidence that during the time when counterfeit Symba products were purchased or seized from ICE and IBE-NY, IBE-FL was supplying those entities with Symba goods. This suffices to raise a question of fact as to whether IBE-FL was acting in concert with the New York Defendants to distribute and sell counterfeit Symba Soap and Symba Cream. As previously noted, Jacob Aini testified that IBE-FL was one of the suppliers of the Symba Cream that was seized from the Maspeth location in November 2001. *See* J. Aini Dep. at 204. Moreover, in an affidavit submitted with IBE-FL's moving papers, Horowitz stated that IBE-FL "traded" Symba merchandise with ICE and IBE-NY as recently as 1999. *See* Horowitz Aff. ¶ 19.

The Florida Defendants argue that other portions of Jacob Aini's deposition testimony suggest that IBE-FL did not supply any of the seized Symba Cream. FL Reply at 9-11. They also argue that Martal cannot "definitively verify" whether the seized Symba Cream was that supplied by IBE-FL or whether the Symba Cream IBE-FL did supply to IBE-NY and ICE was in fact counterfeit. *Id.* at 6-8. Finally, they note that Martal's investigator Michael Kessler testified that none of the Symba products he purchased from the Florida Defendants during the course of his undercover investigation was counterfeit. *Id.* at 11. If Martal's burden at this stage of the proceeding was to prove "definitively" that the Florida Defendants used counterfeit Symba products in commerce, the Florida Defendants' motion might succeed. However, Martal need only introduce evidence that raises a question of fact on this score, which it has done.

With respect to the relatedness of the Florida and New York Defendants, I note only that in attempting to refute Martal's claims in this regard, the Florida Defendants concede the essential fact: that the respective entities are substantially related. *See* FL Reply at 15. They appear to argue that their relatedness extends only to the lawful importation and distribution of health and beauty products. This argument misses the mark. The relatedness and overlap in operations is merely another source of evidence that the Florida Defendants were involved in the distribution or sale of counterfeit Symba goods. Michael Aini, the sole owner of ICE, an entity that has sold and distributed counterfeit Symba products, is also a 50 percent owner of IBE-FL. Answer ¶ 19. Finally, on the issue of Horowitz's personal involvement, I note that he personally testified as to his direct involvement in IBE-FL's sale of Symba Cream to IBE-NY in 2000 and, more generally, his oversight over all of IBE-FL's purchasing. *See* Martal FL Opp. Ex. F (deposition of Symcha Horowitz) at 30-32.

Based on the foregoing, I recommend that the court deny the Florida Defendants' cross-motion for summary judgment with respect to Martal's claims. In light of this analysis, I further recommend that the court grant Martal's motion for summary judgment with respect to the Florida Defendants' first affirmative defense that Martal has failed to state a claim, but recommend that the court deny Martal's motion for summary judgment with respect to the Florida Defendants' fourth, fifth, sixth, and ninth affirmative defenses asserting, respectively, that the products at issue were not counterfeit, and that they were innocent infringers. The evidence submitted by the Florida Defendants in connection with their cross-motion for summary judgment while insufficient to warrant granting that motion in their favor, does raise questions of fact with respect to the genuine nature of the goods they sold to IBE-NY and ICE, and with

respect to their innocence.  *See e.g.,* FL Reply Ex. A (deposition of Frank Kriger) at 18 (testifying

that Symba Cream IBE-FL purchased from Carib and sold to IBE-NY in January 2000 was

genuine); FL Reply Ex. D (deposition of Michael Kessler) at 263 (discussing his undercover

investigation of IBE-FL and noting that none of the Symba products purchased from IBE-FL

during the course of this investigation was counterfeit).  Finally, because I recommend denying

the Florida Defendants' cross-motion for summary judgment with respect to Martal's claims, I

also recommend that the court deny its request for fees and costs pursuant to 35 U.S.C. § 1117.

*See* FL. Memo. at 15.

        B.      <u>The ICE Defendants</u>

        The ICE Defendants move for summary judgment on the same grounds as the Florida

Defendants, substituting a complaint about the state of the record as to Michael and Jacob Aini

for the Florida Defendants' similar argument with respect to Horowitz.  NY Memo. at 6, 8.  As

discussed, the record before me compels a result that is the exact opposite of that which the ICE

Defendants seek through their cross-motion with respect to ICE and Michael Aini.  The

undisputed facts demonstrate that ICE sold counterfeit Symba goods and that Michael Aini was

directly and actively involved in this infringing conduct.  Although Martal did not present

sufficient evidence of Jacob Aini's direct involvement to warrant a finding of his personal

liability for purposes of its summary judgment motion, I do conclude that sufficient questions of

fact exist on this score to deny the cross-motion for summary judgment with respect to him.

Accordingly, I recommend that the court deny in its entirety the New York Defendants' motion

for summary judgment.

V.     Relief

Martal seeks a permanent injunction, statutory damages, attorneys' fees, and costs and moves to hold the New York Defendants jointly and severally liable for such damages.  Martal Memo. at 35.

A      Injunctive Relief

Martal seeks a permanent injunction barring defendants from any future trademark infringement, including prohibiting defendants "[f]rom possessing, receiving, manufacturing, assembling, distributing, warehousing, shipping, transshiping, transferring, storing, advertising, promoting, offering, selling, offering or holding for sale, disposing, or in any other manner handling or dealing with any goods, packaging, wrappers, containers and recepticals, and any catalogues, price lists, promotional materials and the like bearing a copy or colorable imitation of the Symba trademarks and/or the Symba trade dress."  PX 14 (proposed order); *see also* Martal Memo. at 14.

The Lanham Act empowers courts "to grant injunctions, according to the principles of equity and upon such terms as the court may deem reasonable, to prevent the violation of any right of the registrant of a mark registered in the Patent and Trademark Office or to prevent a violation under subsection (a), (c), or (d) of section 1125 of this title."  15 U.S.C. § 1116(a).  To obtain a permanent injunction Martal must demonstrate both the likelihood of irreparable injury in the absence of such an injunction, and success on the merits.  *See Roach v. Morse*, 440 F.3d 53, 56 (2d Cir. 2006).  As discussed in the preceding section, Martal has demonstrated success on the merits of its Lanham Act claims with respect to the New York Defendants' sale and distribution of Symba Soap, if not with respect to Symba Cream.  Moreover, once "proof of a

likelihood of confusion" is established, as Martal has done, the requirements of "both likelihood of success on the merits and irreparable harm" are met.  *Brennan's Inc. v. Brennan's Rest.*, 360 F.3d 125, 129 (2d Cir. 2004).  Therefore, I recommend granting Martal's motion for a permanent injunction as to Symba Soap, and recommend similar relief as to Symba Cream in the event the defendants fail to prove their affirmative defense of invalidity at trial.

B       Statutory Damages

In lieu of attempting to prove and recover its actual damages, Martal asks the court to award it statutory damages.  On the record before me, Martal is entitled to recover statutory damages pursuant to 15 U.S.C. § 1117(c) as to Symba Soap, but not yet as to Symba Cream.  However, because the full extent of the New York Defendants' infringing conduct is not yet known, a recommendation as to the appropriate amount of damages is premature.

C.      Attorneys' Fees

Martal seeks attorneys' fees, costs, and expenses, including the cost of hiring an investigator, pursuant to 15 U.S.C. § 1117(c).  Attorneys' fees and costs may be awarded under the Lanham Act in "exceptional circumstances."  *Danone Asia PTE. Ltd.*, 2006 WL 845573, at *9; *see also Sarah Lee Corp.*, 36 F. Supp.2d at 170.  Willful infringement constitutes such exceptional circumstances and "determines the right to attorneys' fees."  *Bambu Sales, Inc. v. Oak Trading Inc.*, 58 F.3d 849, 854 (2d Cir. 1995).

There is some question, however, as to whether a separate award of attorneys' fees is available in conjunction with an award of statutory damages under § 1117(c) (as compared to an award of actual or treble damages under, respectively, subsection (a) or (b)).  *See Rolex Watch U.S.A., Inc. v. Brown*, 2002 WL 1226863, at *3 (S.D.N.Y. June 5, 2002) (noting that § 1117(c)

"refers to awarding statutory damages instead of damages under § 1117(a)") (internal quotation marks omitted); *see also Gucci Am., Inc.*, 315 F. Supp.2d at 522 (declining to award attorneys' fees on the grounds that the maximum statutory damages awarded and other damages previously awarded "sufficiently advances the goals of deterrence and compensation in this case"); *Rodgers v. Anderson*, 2005 WL 950021, at *4 (S.D.N.Y. Apr. 26, 2005) (declining to determine whether § 1117(c) permits attorneys' fees on the ground that the enhanced statutory damages awarded "more than suffices ... to make Plaintiff ... whole"). Nonetheless, most courts have awarded attorneys' fees in addition to awarding statutory damages under § 1117(c). *See, e.g., Tiffany (NJ) Inc. v. Lucan*, 282 F. Supp.2d 123, 125 (S.D.N.Y. 2003) (awarding attorneys' fees plus costs); *Rolex Watch U.S.A., Inc. v. Jones*, 2002 WL 596354, at *6 (S.D.N.Y. Apr. 17, 2002) (awarding attorneys' fees plus costs, except those costs not sufficiently documented); *Sara Lee Corp.*, 36 F. Supp.2d at 170-71.

As I make no recommendation as to damages, I also believe it is premature to make any recommendation with respect to Martal's request for attorneys' fees. Before the judgment amount is known, it would be premature to determine whether it is sufficient to make Martal whole, or whether an additional award of attorneys' fees is justified.

## VI.  Recommendations

For the reasons set forth above, I respectfully recommend that the court enter an order

- Granting partial summary judgment to Martal on all of its claims against all of the New York Defendants except Jacob Aini with respect to these defendants' distribution and sale of Symba Soap, with the issue of relief to be decided later;

- Granting partial summary judgment to Martal on all of its claims against all of the New York Defendants except Jacob Aini with respect to these

defendants' distribution and sale of Symba Cream to the extent that the court deems established the all elements except the validity of the trademark, leaving for later fact-finding a determination of the affirmative defense of trademark invalidity and also reserving the issue of damages in the event the defendants cannot prove the affirmative defense;

- Granting Martal's motion for summary judgment on all of the defendants' counterclaims;

- Denying Martal's motion for summary judgment with respect to the New York Defendants' third and fifth affirmative defenses, but granting Martal's motion with respect to all other affirmative defenses raised by the New York Defendants and dismissing same;

- Denying Martal's motion for summary judgment with respect to the Florida Defendants' fourth, fifth, sixth, ninth, and twelfth affirmative defenses, but granting Martal's motion with respect to all other affirmative defenses raised by the Florida Defendants and dismissing same;

- Denying the defendants' respective motions for summary judgment; and

- Denying the defendants' motion to amend their Answer.

VII.    Orders

With respect to the pretrial motions that seek non-dispositive relief, I order as follows:

- I grant the defendants' motion to depose Sarner solely for the limited purpose of questioning him about his knowledge and awareness with respect to those goods listed in the 368 Registration, but deny their motion in all other respects;

- I deny the defendants' motion to depose Susan Peterson and Roger Bundhoo; and

- I deny, without prejudice to renewal, the parties' respective motions for sanctions.

VIII.   Objections

This Report and Recommendation and Order will be filed electronically on the court's

ECF system and is deemed served on all parties as of the date of such filing.  The parties may

object to the recommendations pursuant to Fed. R. Civ. P. 72(b), and may seek reconsideration of

any order that is clearly erroneous or contrary to law by making such objections to the assigned

district judge pursuant to Fed. R. Civ. P. 72(a).  Any objections to this Report and

Recommendation and Order must be filed with the Clerk of the Court with a courtesy copy to me

by October 6, 2006.  Failure to file objections within this period, absent an order enlarging the

period pursuant to Fed. R. Civ. P. 6(b)(1), waives the right to appeal the District Court's Order.

*See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72; *Beverly v. Walker*, 118 F.3d 900, 902 (2d Cir.

1997); *Savoie v. Merchants Bank*, 84 F.2d 52, 60 (2d Cir. 1996).

**SO ORDERED.**

Dated:  Brooklyn, New York
           September 22, 2006

/s/ James Orenstein
JAMES ORENSTEIN
U.S. Magistrate Judge
