UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------- X
Martal Cosmetics, Ltd.,

          Plaintiff,

    -against-           Case No. 01-cv-7595 (TLM)

International Beauty Exchange Inc. et al.,

          Defendants,
----------------------------------------------------- X

<u>RULING</u>

   This matter was tried before the Court as a bench trial on July 25-29 and August 1 and 2, 2011. At the close of trial, the Court advised the attorneys for the parties that it would issue a written ruling as soon as practicably possible after receipt of the attorneys' post-trial filings that they had previously been verbally ordered to file prior to and during trial and memorialized by the Court's Order dated August 2, 2011. (Rec. Doc. 515).

   In this ten-year old case, a number of issues were resolved by motion practice prior to trial on the merits and are law of the case. "Under the law of the case doctrine, a decision on an issue of law made at one stage of a case becomes binding precedent to be followed in subsequent stages of the same litigation. '[T]he doctrine posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case.'" *In re PCH Assocs.*, 949 F.2d 585, 592 (2d Cir. 1991) (*quoting Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 815-16, 108 S.Ct. 2166, 2177 (1988)). "We have limited district courts' reconsideration of earlier decisions . . . by treating those decisions as law of the case, which gives a district court discretion to revisit earlier

rulings in the same case, subject to the caveat that 'where litigants have once battled for the court's decision, they should neither be required, nor without good reason permitted, to battle for it again.' Thus, those decisions may not usually be changed unless there is 'an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent a manifest injustice.'" *Official Comm. of Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP*, 322 F.3d 147, 167 (2d Cir. 2003)(*quoting Zdanok v. Glidden Co.*, 327 F.2d 944, 953 (2d Cir.1964) and *Virgin Atl. Airways, Ltd. v. Nat'l Mediation Bd.*, 956 F.2d 1245, 1255 (2d Cir.1992)). The Court sets out with specificity in its findings of fact and conclusions of law when it relies on decisions made previously by other District Court Judges in this litigation that are "law of the case" and are relevant to its decision on the issues that remained before the Court that were resolved by trial on the merits.

In any bench trial, the trial judge, as the finder of fact, has to evaluate the credibility of the witnesses that testify, based on the witnesses' demeanor, any previous inconsistent statements made by a witness prior to and during the witness's trial testimony, the witness's explanation for any such inconsistent statements as well as the documentary evidence in the record. The United States Supreme Court has stated that "[t]rial judges have the unique opportunity to consider the evidence in the living courtroom context, while appellate judges see only the cold paper record." *Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 438, 116 S. Ct. 2211, 2225 (1996) (citations omitted). The United States Court of Appeals for the Second Circuit has observed that "the full flavor of a hearing cannot be sensed from the sterile sheets of a transcript." *ABC, Inc. v. Stewart*, 360 F.3d 90, 100 (2d Cir. 2004)

(quoting *Soc'y of Prof'l Journalists v. U.S. Sec'y of Labor*, 616 F. Supp. 569, 578 (D. Utah 1985)).   The Court's findings of fact that follow are in no small part based on the trial judge's view of the credibility of the witnesses that testified, based on their trial testimony, as well as the documentary evidence and the explanation of, or reconciliation or lack thereof, of any previous inconsistent statements, written or oral, made by a witness.

As a result of the footprint of the courtroom in which the trial was conducted, the trial judge was seated between three and six feet of each witness that testified as the witness testified.

The first witness to testify on July 25 and 26, 2011 in plaintiff's case-in-chief was defendant Harry Aini (H. Aini).   The second witness to testify on July 26, 2011 was defendant Michael Aini (M. Aini).   The third witness to testify on July 27 and 28, 2011 was defendant Jacob Aini, a.k.a. Jack Aini (J. Aini).   The fourth witness to testify on July 29 and August 1, 2011 was plaintiff Martal Cosmetic's director Marcus Sarner (Sarner).   H. Aini was recalled to testify in defendants' case-in-chief on August 1 and 2, 2011.   The fifth witness to testify on August 2, 2011 was Raquel Aini, a.k.a. Rachel Aini (R. Aini), whose testimony was given in plaintiff's case-in-chief.

In sum the Court found the testimony of H. Aini, M. Aini, J. Aini and R. Aini riddled with inconsistencies, contradicted time and again by the documentary evidence, contradictory to their own testimony during and prior to trial and to the testimony of one another on the same issue(s) on numerous occasions and almost totally devoid of any reasonable, understandable explanation between the documentary evidence and their oral testimony despite being given the opportunity, in some instances more than one opportunity,

3

to explain the contradiction in the documentary evidence and their trial and previous testimony and statements.

The Court found Sarner's testimony to be credible, generally consistent and, given his age, sight and other medical infirmities, thoughtful and deliberate, correcting himself after reflection, in some instances when such correction might not necessarily be advantageous to the claims his company asserted in this litigation.

In any trial, civil or criminal, there are two types of evidence the trier of fact may consider: direct evidence, such as testimony of an eye witness, and indirect or circumstantial evidence, the proof of circumstances that tend to prove or disprove the existence or nonexistence of certain other facts.  The law makes no distinction between direct and circumstantial evidence.  In a civil case such as this one, depending on the nature of the claim, the law simply requires that the trier of fact find the facts from a preponderance of all the evidence or by clear and convincing evidence.  In this case, plaintiff's claims had to be proven by a preponderance of the evidence and defendants' affirmative defense had to be proven by clear and convincing evidence.

The Court makes the following findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a).  In some instances a finding of fact may also be a mixed conclusion of law and in other instances a conclusion of law may include findings of fact.

***Findings of Fact***

**I.  Background**

1. Plaintiff's complaint in this action was filed on November 15, 2001 in the United States District Court for the Eastern District of New York. (Rec. Doc. 1).

2. The case was originally assigned to the Honorable John Gleeson, United States District Judge.  The case was re-assigned to the Honorable Sandra J. Fuerstein, United States District Judge, on October 16, 2003.  The case was next re-assigned to the Honorable Roslynn R. Mauskopf, United States District Judge, on December 26, 2007.  The case was transferred to the undersigned, as visiting United States District Judge, on August 19, 2009. (Rec. Doc. 409).

3. Martal Cosmetics, Ltd. (Martal) is a British corporation founded by Marcus Sarner in 1966 that sells a variety of health and beauty products and began selling Symba products, including Symba cream and Symba soap in West Africa and in the United Kingdom in the early 1970s.  Martal used contract manufacturers to produce its product.  Sarner was the only employee of Martal, although his wife assisted him. (Sarner, Trial Tr., 802-07, July 28, 2011).

4. The defendant Ainis are all members of the same family.  H. Aini, M. Aini and J. Aini are brothers, and R. Aini is married to J. Aini.  (J. Aini, Trial Tr., 529-30, July 27, 2011).

5. The remaining defendants, all corporations, are part of a hydra of corporations that were owned by the Ainis: Homeboys International, Homeboys Discount, K.A.K. Group, Inc. d/b/a International Beauty Exchange (KAK), I.B.E. Cosmetics (IBE-NY) and I.C.E. Marketing Corp (ICE).

   a.  H. Aini is the president and H. Aini and M. Aini each own 50 percent of

5

Homeboys International, which was a retail store with up to four locations. (H. Aini, Trial Tr., 58, 61-62, 69, 76, July 25, 2011; M. Aini, Trial Tr., 324, July 26, 2011).  H. Aini and M. Aini purchased the fixtures and inventory of Homeboys Discount from their brother J. Aini in 1995 to create Homeboys International. (H. Aini, Trial Tr., 69-70, July 25, 2011; J. Aini, Trial Tr., 533, 710-12, July 27, 2011; Defendants' Exhibit 2).  J. Aini testified that his brothers paid $27,000 in cash and paid the balance of the $150,000 purchase price over time, but he could not remember over what period of time.  (J. Aini, Trial Tr., 711-12, July 27, 2011).  H. Aini testified that Homeboys International dissolved in 2010.  (H. Aini, Trial Tr., 57, July 25, 2011).

b.  H. Aini and M. Aini are also both 50 percent owners of ICE. (H. Aini, Trial Tr., 78, July 25, 2011; M. Aini, Trial Tr., 289, July 26, 2011).  ICE was an importer and wholesaler of beauty products and contracted to manufacture health and beauty products outside the United States.  (H. Aini, Trial Tr., 175, July 25, 2011; M. Aini, Trial Tr., 295, July 26, 2011).  M. Aini was president of ICE. (M. Aini, Trial Tr., 280, July 26, 2011).

c.  H. Aini was the 100 percent owner of IBE-NY. (H. Aini, Trial Tr., 165, July 25, 2011; H. Aini, Trial Tr., 1285, August 1, 2011).  IBE-NY was a distributor of health and beauty products to retailers, including Homeboys International. (H. Aini, Trial Tr., 170-71, July 25, 2011).  In 1999, H. Aini purchased the assets of KAK to form IBE-NY.  (H. Aini, Trial Tr., 171-73, July 25, 2011).  M. Aini was a 33 percent owner of KAK.  (H. Aini, Trial Tr., 171-73, July 25,

6

2011; M. Aini, Trial Tr., 380).  H. Aini testified that he was not employed at KAK, but that he used a desk there as a buyer from 1997 to 1999.  (H. Aini, Trial Tr., 171, July 25, 2011; H. Aini, Trial Tr., 1433-34, August 2, 2011).

d.  ICE and IBE-NY shared the same warehouse location at 56-25 Flushing Avenue in Maspeth, New York.  (H. Aini, Trial Tr., 175, July 25, 2011).  H. Aini and M. Aini testified that part of IBE-NY's rental agreement was for it to maintain the facilities, pay all the building's expenses and pay for all the employees, so ICE used IBE-NY's employee to do all of the manual labor for ICE.  (H. Aini, Trial Tr., 176, July 25, 2011; M. Aini, Trial Tr., 306-309, 421, July 26, 2011).  The Flushing Avenue property was owned by Choul Realty, which was owned by M. Aini. (H. Aini, Trial Tr., 176-77, July 25, 2011; M. Aini, Trial Tr., 307, July 26, 2011).  H. Aini testified that IBE-NY dissolved in 2006 when he sold all the assets to Sadi Srour, his first cousin, who had been the warehouse manager for IBE-NY, who then formed International Beauty Trade.  (H. Aini, Trial Tr., 1353-55, August 1, 2011).  International Beauty Trade operates out of the same building, 56-25 Flushing Avenue, as did IBE-NY, and H. Aini testified that at the time of trial he worked at International Beauty Trade, buying and selling merchandise.  (H. Aini, Trial Tr., 168-170, July 25, 2011; H. Aini, Trial Tr., 1353-55, August 1, 2011).

e.  M. Aini was also a 50 percent owner of IBE-FL, a former defendant in this action, with Symcha Horowitz, another former defendant.  (M. Aini, Trial Tr., 319, July 26, 2011).

f.  H. Aini testified he worked in his parents' store, Sheila Discount, which sold health and beauty products, full-time after he finished eighth grade. (H. Aini, Trial Tr., 54-55, July 25, 2011).

g.  Prior to 1995, J. Aini had retail stores in New York called Homeboys Discount, and wholesale operations called ABCE Wholesale, which was in the export business, and Zuri, which was in the import business.  (J. Aini, Trial Tr. 731-33, July 28, 2011).  J. Aini testified that Homeboys Discount and ABCE Wholesale were held in J. Aini's name, and Zuri was in R. Aini's name although he testified in a hearing in *Aini v. Sun Taiyang Co.*, a case in the Southern District of New York before United States District Judge Lewis A. Kaplan, on December 17, 18 and 19, 1996 that all four companies were in his wife, R. Aini's, name. (J. Aini, Trial Tr., 729-39, July 28, 2011).  The Court found his explanation, that money between him and his wife is shared even if that is not what is technically reflected in the legal documents, not to be credible.

6.  The individual defendants contradicted themselves on the issues of ownership of and their relationship to the defendant corporations on numerous occasions.

a.  H. Aini contradictions:

i.  H. Aini testified at trial that he was the president and 50 percent shareholder in defendant corporation Homeboys International (H. Aini, Trial Tr., 58, July 25, 2011).  However, in his deposition in *Sara Lee Corp. v. Aini* taken July 17, 2003, H. Aini testified that he was the only

8

owner of Homeboys International. (H. Aini, Trial Tr., 58-63, July 25, 2011).  M. Aini owns the other 50 percent of Homeboys International. (H. Aini, Trial Tr., 69, July 25, 2011).   H. Aini also stated in an affidavit (Plaintiff's Exhibit 1) in this action that ICE was "my brother Michael's separate company" but testified at trial that he was in fact a 50 percent owner of ICE.  (H. Aini, Trial Tr., 95-96, July 25, 2011). The Court found H. Aini's explanation, that he was only involved in the day-to-day running of Homeboys International and that M. Aini ran ICE (H. Aini, Trial Tr., 96-99, July 25, 2011), not to be credible. Plaintiff's Exhibit 2A is a business card for ICE that reads "ask for Mike or Harry"; however, H. Aini testified that the card was never used. (H. Aini, Trial Tr., 100-03, July 25, 2011; Plaintiff's Exhibit 2A).

ii.  At trial H. Aini testified that he was the 100 percent owner of IBE-NY; however, in his deposition in *Sara Lee Corp. v. Aini* taken July 17, 2003, he claimed he could not recall whether he was the 100 percent owner.  (H. Aini, Trial Tr., 165-67, July 25, 2011).

iii.  At trial, H. Aini testified that his parents lent him the money to buy Homeboys International (H. Aini, Trial Tr., 70-71, July 25, 2011), but in his deposition taken July 17, 2003 in *Sara Lee Corp. v. Aini*, he was unable to remember which family member lent him the money (H. Aini, Trial Tr., 73-75, July 25, 2011).

iv.  On the first day of his testimony, July 25, 2011, H. Aini testified that

when J. Aini was working in Paris, he did not know if J. Aini was doing business for Homeboys and that he did not know where his brother was working when he was in Paris.  (H. Aini, Trial Tr., 111-12, 114, July 25, 2011).  However, the next day, H. Aini testified that he knew J. Aini "was working in Paris using the Homeboy's name and had nothing to do with my company" but he gave J. Aini permission to use the Homeboys name. (H. Aini, Trial Tr., 240, 263-64, July 26, 2011).

b.  M. Aini contradictions:

i.  At a contempt hearing conducted in 2002[1] in this proceeding before United States Magistrate Judge A. Simon Chrein, M. Aini testified that he was the owner of ICE; however, at trial, M. Aini testified that he and H. Aini were each 50 percent shareholders in ICE.  (M. Aini, Trial Tr., 287-91, July 26, 2011).  The Court found M. Aini's explanation, that he just forgot, not to be credible, particularly in light of M. Aini's deposition testimony of January 11, 2001 in *International Cosmetics Exchange, Inc. v. Gapardis Health and Beauty, Inc.* when he stated, correctly, that he and H. Aini were each 50 percent shareholders of ICE.  (M. Aini, Trial Tr., 292-95, July 26, 2011).

---

[1]  The Court notes that in the trial transcript plaintiff's counsel referred to it as the June 2002 contempt hearing (Trial Tr., 287, July 26, 2011); however, the docket reveals that the hearing was commenced on May 21, 2001 and continued to June 25 and 26, 2002, before Magistrate Judge A. Simon Chrein.  (Rec. Docs. 64, 77-79).

ii. At his deposition in *Sara Lee Corp. v. Aini* taken on August 5, 2004, M. Aini did not know the difference between Homeboys Discount, the company whose assets his brother J. Aini sold to him and his brother H. Aini, and Homeboys International, the company M. Aini and H. Aini formed with those assets and each owned 50 percent of. (M. Aini, Trial Tr., 325-29, July 26, 2011).  At that same deposition on August 5, 2004, M. Aini also stated he did not have any ownership in Homeboys International.  (M. Aini, Trial Tr., 326-29, July 26, 2011).

iii. Further, in his August 5, 2004 deposition in *Sara Lee Corp. v. Aini*, M. Aini stated that J. Aini did not have a position at ICE; however, at trial M. Aini testified that J. Aini was secretary for ICE.  (M. Aini, Trial Tr., 334-40, July 26, 2011).

c.  J. Aini contradictions:

i. J. Aini testified at trial that he sold his Homeboys Discount stores to his brothers H. Aini and M. Aini in 1995 when he moved to Paris; however, in his deposition taken in this proceeding on November 27, 2001, he stated that he sold Homeboys Discount to his brother H. Aini. (J. Aini, Trial Tr., 533-36, July 27, 2011).

ii. J. Aini further testified in his November 27, 2001 deposition in this proceeding that M. Aini was the only owner of ICE. (J. Aini, Trial Tr. 644-45, July 27, 2011).  The Court found J. Aini's explanation, that he found out about H. Aini's interest in ICE when plaintiff's counsel

11

subpoenaed tax returns during this litigation, not to be credible.  (J. Aini, Trial Tr., 647-49, July 27, 2011).

**II.     J. Aini involvement**

7.  Since the early 1980s, J. Aini has owned and operated businesses in the beauty products industry.  (J. Aini, Trial Tr., 532, July 27, 2011).  He started Homeboys Discount retail stores in the early 1980s and ABCE, a wholesale business, in around 1987.  (J. Aini, Trial Tr., 533, 536-38, July 27, 2011).

8.  At some point in 1988 or 1989, J. Aini and R. Aini met Sarner in England to discuss importing Symba into the United States. (J. Aini, Trial Tr., 676-78, July 27, 2011; J. Aini, Trial Tr., 756-57, July 28, 2011; Sarner, Trial Tr., 857-58, July 28, 2011).

9.  In 1989, Martal began distributing large commercial quantities of Symba products directly into the United States through J. Aini.  (Sarner, Trial Tr., 1139-43, July 29, 2011).

10. J. Aini testified that he started a company with the same name as a well-known African line of makeup, Zuri, and was sued by the owner of the trademark.  (J. Aini, Trial Tr., 551-53, July 27, 2011).  He testified that he settled the case and dissolved Zuri after liquidating the company's assets.  (J. Aini, Trial Tr., 553-56, July 27, 2011).  ICE took over Zuri's customer list when it dissolved and J. Aini moved to Paris.  (Finding of Fact 12.a).

11. J. Aini sought to enter into an exclusive distribution agreement with a Dominican Republic company called Laboratorias Roldan, (J. Aini, Trial Tr., 574-75, July 27, 2011).  When Laboratorias Roldan refused to enter into an exclusivity agreement, J.

Aini and R. Aini partnered with Symcha Horowitz to start a corporation named Roldan in the United States in 1993.  (J. Aini, Trial Tr., 560-62, July 27, 2011).  J. Aini's Roldan, on advice of counsel, contracted to have manufactured its own version of Roldan beauty products and applied for the United States trademark of the Roldan mark.  (J. Aini, Trial Tr., 575, July 27, 2011).  J. Aini chose the name Roldan.  (J. Aini, Trial Tr., 562, July 27, 2011).  J. Aini testified that he made all of the major decisions in the Roldan company. (J. Aini, Trial Tr., 564, July 27, 2011).  Although there are some factual differences between the *Roldan* case and the case presently before the Court, the Second Circuit has relied on prior trademark suits as evidence of willfulness.  *Bambu Sales v. Ozak Trading Inc.*, 58 F.3d 849, 854 (2d Cir. 1995).  J. Aini, R. Aini, Horowitz and J. Aini's companies Roldan, Zuri, Homeboys Discount and ABCE Wholesale were all sued by the Dominican Republic company Laboratorias Roldan and United States District Judge K. Michael Moore of the Southern District of Florida, issued a preliminary injunction against the defendants in the *Roldan* case.  Defense counsel stipulated that the case settled and was dismissed.  (Trial Tr., 584-85, July 27, 2011).

12. J. Aini's involvement with ICE:  J. Aini testified that he "had nothing to do with ICE."  (J. Aini, Trial Tr., 613-14, July 27, 2011).  However, his testimony and the record contradict that statement.

    a. ICE took over the customers of J. Aini's company, Zuri, when J. Aini liquidated Zuri and moved to Paris in 1995. (M. Aini, Trial Tr., 284-87, July 26, 2011; *see also* Finding of Fact 10).

b. J. Aini was the secretary for defendant ICE and a buyer, with the authority to make purchases of beauty products from foreign manufacturers on ICE's behalf.  (M. Aini, Trial Tr., 296-97, July 26, 2011; J. Aini, Trial Tr., 640-41, July 27, 2011).  J. Aini also testified that he was only a buyer's agent for ICE, trying to bring in new projects, i.e. product lines, to earn a commission. (J. Aini, Trial Tr., 601, July 27, 2011).  J. Aini later testified that he was not involved with buying any goods for ICE.  (J. Aini, Trial Tr., 756, July 28, 2011).

c. J. Aini stated in a sworn declaration dated June 11, 2007 in *I.C.E. Marketing, Corp. v. Neutrogena Corp.* that he was the secretary of ICE from April 1995 to 2007, but H. Aini testified that J. Aini was not the secretary of ICE.  (H. Aini, Trial Tr., 178-81, July 25, 2011).

d. M. Aini testified that whenever ICE was involved in a lawsuit, J. Aini handled it for ICE.  (M. Aini, Trial Tr., 343-44, July 26, 2011).  J. Aini also signed a loan of about $300,000 on behalf of ICE; M. Aini testified that he gave J. Aini permission to sign the loan contract.  (M. Aini, Trial Tr., 344-45, July 26, 2011).  M. Aini also testified he gave J. Aini permission to file a complaint on behalf of ICE that stated that J. Aini and his father-in-law owned ICE.  (M. Aini, Trial Tr., 348-52, July 26, 2011).  M. Aini also testified that J. Aini was copied on a letter to ICE's insurance carrier about coverage for this litigation because J. Aini "was responsible for handling the insurance." (M. Aini, Trial Tr., 354-56, July 26, 2011; Plaintiff's Exhibit 40).

14

e. J. Aini testified that when he returned from Paris in 1997 he used an office in the 56-25 Flushing Avenue, where ICE and IBE-NY were located, to watch the stock market with M. Aini.  (J. Aini, Trial Tr., 613, July 27, 2011).

13. J. Aini's involvement with Homeboys:

a. Plaintiff's Exhibit 2B is a business card for J. Aini and R. Aini that lists them as buyers and agents of both ICE and Homeboys.  (H. Aini, Trial Tr., 104, 107, July 25, 2011; Plaintiff's 2B).  H. Aini testified that the information contained on the card was not correct.  (H. Aini, Trial Tr., 105, July 25, 2011). Although H. Aini testified that the Homeboys International in Paris had nothing to do with his New York-based Homeboys International (H. Aini, Trial Tr., 263-64, July 26, 2011) and that the information on the card was not true (H. Aini, Trial Tr., 104-05, July 25, 2011), the card listed offices in New York, as well as Paris and Belgium, for Homeboys, and Paris and New York for ICE, and listed 56-25 Flushing Avenue as the New York office address, which was the location of ICE and IBE-NY.  (Plaintiff's Exhibit 2B).

b. Plaintiff's Exhibit 3 is a business card for J. Aini and R. Aini, listed as Cosmetique Consultants, which lists the Homeboys International address and the store's phone number and fax number.  (H. Aini, Trial Tr., 115-17, July 25, 2011; Plaintiff's Exhibit 3).

c. J. Aini testified that he received a letter from an insurance company, addressed to him at Homeboys, Inc., at the 1805-07 Church Street, Brooklyn address of the Homeboys International owned by his brother H. Aini.  (J. Aini, Trial Tr.,

619-22, July 27, 2011; Plaintiff's Exhibit 5).   The Court found J. Aini's explanation, that the claim was for a product he had worked on and the insurance company contacted him because it was his insurance company when he ran Homeboys Discount, (J. Aini, Trial Tr. 620-22, July 27, 2011), not to be credible.

d.   J. Aini, in a deposition taken in *I.B.E., Inc. v. Balekjian* on December 8, 2003, when asked "[w]hat is the name of your retail store?" stated "Homeboys International."  (J. Aini, Trial Tr., 626-27, July 27, 2011).  The Court found his explanation, that earlier in the deposition he had stated that he owned the retail store prior to moving to Paris and H. Aini and M. Aini owned it at the time of the deposition (J. Aini, Trial Tr., 627-31, July 27, 2011), explained, in part, the inconsistency, but demonstrated yet again how inextricably intertwined the Aini brothers and the various corporations were and their near constant conflation of the entities and ownership.

14. J. Aini involvement in IBE-NY

a.   J. Aini, as secretary for IBE-NY, filed a petition for cancellation on behalf of IBE-NY against G.I.P. C.I. Inc. before the United States Patent Office Trademark Trial and Appeal Board on May 10, 2006.  In the petition, actions of J. Aini, such as going to Europe to secure proprietary rights to skin care products and making arrangements for the products to be "manufactured, and packaged, in Switzerland, and then shipped to New York" were attributed to IBE-NY.  (H. Aini, Trial Tr., 155-56, July 25, 2011; J. Aini, Trial Tr., 771-78,

July 28, 2011; Plaintiff's Exhibit 19).  However, H. Aini testified that IBE-NY never contracted for the manufacture of products abroad.  (H. Aini, Trial Tr., 1357, August 1, 2011).  H. Aini testified that he gave J. Aini the authority to act on IBE-NY's behalf in the lawsuit as the secretary of the corporation because IBE-NY was the customer and needed to be the petitioner to show lost sales.  (H. Aini, Trial Tr., 150-54, July 25, 2011; H. Aini, Trial Tr., 1367-75, August 1, 2011; H. Aini, Trial Tr., 1425-28, August 2, 2011).  However, H. Aini also testified that he no longer owned the company when the petition was filed in 2006.  (H. Aini, Trial Tr., 167-70, July 25, 2011).

b.  J. Aini testified from 1997 to 2002 he could not recall whether he was a buyer for IBE, (J. Aini, Trial Tr., 615, July 27, 2011), but later testified that he never made purchases for IBE-NY. (J. Aini, Trial Tr., 755, July 28, 2011).

c.  On October 1, 2001, J. Aini, along with M. Aini, received a fax for an exclusive distributorship with M.C.A. Medical addressed to IBE-NY and J. Aini responded to the fax with a handwritten note.  (Plaintiff's Exhibit 14, at 820; J. Aini, Trial Tr., 764-69, July 28, 2011).  Although J. Aini and H. Aini testified that the project was for ICE and that the sender of the fax had been confused by the IBE-NY sign outside the warehouse at 56-25 Flushing Avenue and the contract was eventually signed on behalf of ICE (J. Aini, Trial Tr., 768-69, 789-94, July 28, 2011; H. Aini, Trial Tr., 1363-64, August 1, 2011; Plaintiff's Exhibit 14, at 823; Defendants' Exhibit 121, at 377), the exhibit and testimony demonstrate yet again that customers were unable to

17

distinguish between the Ainis' corporate entities.  The Court notes further that when MCA drafted the contract, they designated J. Aini as the chairman of ICE, and he crossed it out and wrote "buyer's agent." (J. Aini, Trial Tr., 787, July 28, 2011; Plaintiff's Exhibit 14, at 823)

15. J. Aini involvement with Symba products:

    a.   J. Aini testified that he called Martal during 1997 and 1999 about getting Symba for a cheaper price and inquiring whether the cheaper Symba product that was available in the market was counterfeit or whether that product was instead meant for the African market.  (J. Aini, Trial Tr., 634-35, July 27, 2011).

    b.   Martal's March 12, 1999 letter ending its sales relationship with IBE-FL was addressed to J. Aini, although J. Aini testified he did not see the letter in 1999. (J. Aini, Trial Tr., 635-36, July 27, 2011).  However, M. Aini testified that J. Aini told him about the letter.  (M. Aini, Trial Tr., 377, July 26, 2011).

    c.   Sarner testified that in his early relationship with J. Aini, the corporate entities changed all the time and he still spoke to J. Aini when he began shipping to IBE-FL. (Sarner, Trial Tr., 859-60, July 28, 2011).  Sarner testified that he assumed J. Aini owned the retail stores where investigators purchased counterfeit product in 1999 because that was how J. Aini held himself out to Sarner in his transactions with him. (Sarner, Trial Tr., 1163-64, August 1, 2011).  Sarner testified that J. Aini was "the only person that I spoke to" about the counterfeit Symba. (Sarner, Trial Tr., 1165, August 1, 2011).   Sarner

testified he was not aware that J. Aini ever left New York to go to Paris in 1995.  (Sarner, Trial Tr., 1166-67, August 1, 2011).  Sarner testified that he had conversations with J. Aini during the period 1995 to 1999 because J. Aini approached him about getting a cheaper price for the Symba goods. (Sarner, Trial Tr., 1171, August 1, 2011).

d. J. Aini contacted E-Pac, the manufacturer of Symba Cream, and Sarner after the July 2001 Queens DA seizure and J. Aini was the one who told M. Aini that there were illegitimate Symba products in the United States because they were being sold for less than cost.  (M. Aini, Trial Tr., 383-84, July 26, 2011; J. Aini, Trial Tr., 650-51, July 27, 2011).  Although M. Aini testified that J. Aini was involved only in bringing new products to ICE and not with the older products that ICE had acquired from J. Aini when he left for Paris, and that he did not buy Symba product after he returned to the United States, the Court found this testimony not to be credible.  (M. Aini, Trial Tr., 412-16, July 26, 2011).

**III.     R. Aini involvement**

16. At trial H. Aini testified that R. Aini was a housewares buyer for Homeboys International, but in his deposition in *Sara Lee Corp. v. Aini* taken July 17, 2003, he stated that R. Aini had never worked at Homeboys.  (H. Aini, Trial Tr., 121-24, July 25, 2011).  The Court found his explanation, that he believed he was answering a prior question, whether R. Aini worked at Homeboys at the time of his deposition (H. Aini, Trial Tr., 251, 254, July 26, 2011), not to be credible.  H. Aini testified that R.

Aini was not a manager at Homeboys International but a housewares buyer; however, she signed a credit application for a plastic housewares company as a general manager and bookkeeper for Homeboys International.  (Plaintiff's Exhibit 8; H. Aini, Trial Tr., 121-24, July 25, 2011).  R. Aini testified that she filled out the application based on H. Aini's instructions.  (R. Aini, Trial Tr., 1525-28, August 2, 2011).

17. R. Aini had her own Homeboys stationary that she testified she used to leave notes for H. Aini.  (R. Aini, Trial Tr., 1529-31, August 2, 2011).

18. R. Aini testified that J. Aini put her name on business cards because she could help with translation as she speaks Arabic, French and Hebrew in addition to English.  (R. Aini, Trial Tr., 1488-89, 1505-06, 1517-20, August 2, 2011; Plaintiff's Exhibit 3). Plaintiff's Exhibit 3 is a card for J. Aini and R. Aini, Cosmetique Consultants, which uses the Homeboys International address at 1805 Church Avenue and the store's telephone number.  (R. Aini, Trial Tr., 1520-22, August 2, 2011).

19. R. Aini testified that she did receive a letter addressed to her at ICE in Paris from Diana de Beauté that referenced her call and Diana Cream but, although the letter was written in English, explained that Diana de Beauté spoke Arabic and French and that was why she had called the company.  (R. Aini, Trial Tr., 1509-12, August 2, 2011).

20. R. Aini testified that she and J. Aini received a letter from an acquaintance in Paris who wanted them to try to introduce his products to the United States and the letter was sent to 1805 Church Avenue in Brooklyn, the location of Homeboys International, on February 22, 2002. (R. Aini, Trial Tr., 1513-1515, August 2, 2011;

Plaintiff's Exhibit 6).

21. R. Aini testified that she and J. Aini went to England and met Sarner in or about 1988, but testified that she was not very involved in the conversation and did not pay attention.  (R. Aini, Trial Tr., 1495, August 2, 2011).

22. R. Aini testified that she recognized her husband's company Zuri because it is her son and father's name, but at her deposition in this case taken April 1, 2003, she testified that she did not know if she recognized the name.  (R. Aini, Trial Tr., 1496-97, August 2, 2011).  R. Aini testified that she was "not in my head" due to personal problems during her pregnancy at the time of her April 1, 2003 deposition.  (R. Aini, Trial Tr., 1498, August 2, 2011).  R. Aini testified at trial that the address of Homeboys International in Paris was 10 Boulevard de Strasbourg, but at her April 1, 2003 deposition she testified that she never knew of the Homeboys International location in Paris.  (R. Aini, Trial Tr. 1507-08, August 2, 2011).

### IV.   Defendants' Willfulness

23. M. Aini, who owned 50 percent of IBE-FL, testified that in 1997 and 1999, IBE-FL sent samples of Symba soap and Symba cream to Martal and received no response.  (M. Aini, Trial Tr., 445-52, July 26, 2011; Plaintiff's Exhibit 140).  Sarner testified he did respond to Symcha Horowitz in 1997, the other 50 percent owner of IBE-FL, and informed him whether the samples were counterfeit or not, but could not remember at the time he testified at trial whether what Horowitz had sent to him was in fact counterfeit.  (Sarner, Trial Tr., 903-07, July 28, 2011).  Sarner later testified that he believed the 1997 shipment from Horowitz contained a very crude counterfeit

21

but that he did not think the samples sent in the 1999 shipment were counterfeit. (Sarner, Trial Tr., 911-14, July 28, 2011).   However, in his written responses to questions posed by defendants, Sarner stated the samples of Symba soap sent in 1999 were counterfeit.  (Sarner, Trial Tr., 922-23, July 28, 2011).  Sarner also testified that he thought the tubes sent by Horowitz were part of a business ploy to become Martal's exclusive distributor and he did not take the counterfeiting seriously in 1997 because Horowitz was the only one of his distributors who sent him any allegedly counterfeit product.  (Sarner, Trial Tr., 907-08, July 28, 2011).  At the time of the April 1999 shipment, Sarner testified that he had already discovered counterfeit product on sale at the Ainis' store, so he was not prepared to give Horowitz a list of the differences between genuine and counterfeit Symba because he worried that the counterfeit product would appear on the market without these differences. (Sarner, Trial Tr., 923-24, July 28, 2011).

24. In January 1998, M. Aini testified IBE-FL sent Martal a draft agreement that would make IBE-FL its exclusive importer in Florida and allowed IBE-FL to enforce Martal's Symba trademark on behalf of Martal. (M. Aini, Trial Tr., 459-60, July 26, 2011; Defendants' Exhibit 30).  Sarner testified that he refused the offer to enter into an exclusive deal in January 1998 because he did not want to give anyone exclusive rights and he had suspicions of counterfeiting and concerns about the Ainis' and Horowitz's involvement in the *Roldan* case.  (Sarner, Trial Tr., 863-65, July 28, 2011; *see* Finding of Fact 11).

25. IBE-FL also sent a letter to Sarner on July 24, 1998 requesting that Martal allow

IBE-FL to send a letter out to Symba customers stating that IBE-FL is the exclusive distributor of Symba products, and Martal and IBE-FL would take "immediate legal action against any manufacturers, importers, distributors or sellers of unauthorized Symba." (M. Aini, Trial Tr., 454-56, July 26, 2011; Plaintiff's Exhibit 140). M. Aini testified IBE-FL never received a response from Sarner regarding the letter it wanted to send to customers. (M. Aini, Trial Tr., 456, July 26, 2011). However, Sarner testified that he refused the offer and an offer from J. Aini to help stop the counterfeiting because he did not want to give any one company the rights to Symba because he would lose control of its distribution and because he thought that J. Aini would "do what he liked with the product" if he were the exclusive distributor. (Sarner, Trial Tr., 866-69, July 28, 2011).

26. Martal made its last shipment of Symba to IBE-FL on November 12, 1998 because Sarner discovered in early 1999 that counterfeit Symba was being sold in stores owned by the Ainis. (M. Aini, Trial Tr., 363, July 26, 2011; Sarner, Trial Tr., 861-62, July 28, 2011; Plaintiff's Exhibit 139). On March 12, 1999, Sarner sent J. Aini, and Symcha Horowitz a letter informing them of Martal's decision to make Symba freely available rather than limit its sales to only IBE-FL. (Plaintiff's Exhibit 52).

27. M. Aini testified that he, Horowitz and J. Aini inspected the Symba product after receiving the letter from Martal in March 1999 and did not notice spelling errors on the packaging. (M. Aini, Trial Tr., 376-78, 435-41, July 26, 2011).

28. Although samples were sent to Martal, J. Aini testified that he did not ask in writing that Martal send samples of genuine Symba for comparison either before the July

2001 Queens DA seizure or between the July 2001 seizure and the November 2001 seizure.  (J. Aini, Trial Tr., 658-59, July 27, 2011).

29. The Court inspected samples of genuine and counterfeit Symba (*see* Trial Tr., 989-90), July 29, 2011).  It is law of the case that the Symba product that was seized was counterfeit (Report and Recommendation dated September 22, 2006 (Rec. Doc. 338, at 34), adopted in pertinent part by Opinion and Order of United States District Judge Sandra J. Fuerstein dated March 22, 2007 (Rec. Doc. 354)), that counterfeit goods were sold by KAK, Homeboy's and IBE-NY (Rec. Doc. 338, at 34), that ICE distributed and sold counterfeit goods (Rec. Doc. 338, at 36), and that H. Aini and M. Aini were the "moving, active conscious force" behind the corporate defendants' infringing conduct and are personally liable for trademark infringement. (Rec. Doc. 338, at 38 and 39).

30. H. Aini and M. Aini were not present for the July 19, 2001 Queens DA seizure as they were in Las Vegas.  (J. Aini, Trial Tr., 702, July 27, 2011; H. Aini, Trial Tr., 1413, August 2, 2011).

31. J. Aini testified that after the Queens DA seizure, he called Sarner, E-Pac, the manufacturer of Symba cream, and Milo Cosmetics, the manufacturer of Symba soap, and he and M. Aini went into the stock room, but said that because they were not told of the differences between genuine and counterfeit products, "there was not much to look at." (J. Aini, Trial Tr., 650-51, 657, July 27, 2011).

32. J. Aini testified that during the July 2001 Queens DA seizure he was not told why the investigators were there, that they seized ten other products in addition to Symba and

that he was not on notice until the second seizure in November 2001 that the Symba goods seized were being alleged to be counterfeit.  (J. Aini, Trial Tr., 702-04, July 27, 2011).  However, each of the Aini brothers testified that they inspected the remaining Symba goods after the seizure.  In addition, J. Aini testified that he contacted E-Pac after the seizure (Finding of Fact 31) and E-Pac responded by fax dated July 23, 2001 addressed to "Mr. Jack Aini, I.C.E., New York," and informed J. Aini that "[i]t is clear that counterfeit product from West Africa has been shipped to European and North American markets."  (Plaintiff's Exhibit 25, at 1310).

33. H. Aini testified that after the Queens DA seizure in July 2001 at the 56-25 Flushing Avenue warehouse, he inspected the Symba product that was left, which he estimated to be between 10 and 20 cases, and was not able to tell that it was counterfeit.  (H. Aini, Trial Tr., 191-95, July 25, 2011; H. Aini, Trial Tr., 1332-33, August 1, 2011). H. Aini testified that he did not notice any spelling errors on the packaging.  (H. Aini, Trial Tr., 208, July 25, 2011).  H. Aini testified that he "looked at it, I examined it and I smelled it" but admitted he had not smelled the product before the July 2001 seizure.  (H. Aini, Trial Tr., 1300, August 1, 2011).  H. Aini testified that he contacted IBE-FL and Arta, a company he had bought Symba from, and concluded that the Symba product was genuine.  (H. Aini, Trial Tr., 210, July 25, 2011).  H. Aini testified that IBE-NY was selling 4,000-5,000 different types of product in 1999 to 2001. (H. Aini, Trial Tr., 1291, August 1, 2011).  H. Aini testified that he was "somewhat" familiar with all the products IBE-NY sold, but that products changed their packaging "all the time." (H. Aini, Trial Tr., 1295, 1297, August 1, 2011).

However, H. Aini further testified that he was never confused about the Symba product packaging and never considered the possibility that the counterfeit Symba might have been a new version of Symba. (H. Aini, Trial Tr., 1356-57, August 1, 2011).

34. M. Aini testified that he inspected the Symba product after the Queens DA seizure and did not notice any spelling errors on the packaging. (M. Aini, Trial Tr., 384-86, 443, July 26, 2011). M. Aini testified that there is no way to tell the difference between the genuine and counterfeit Symba. (M. Aini, Trial Tr., 488, July 26, 2011).

35. H. Aini testified that after the Queens DA seizure his brothers hired a lawyer to help them find out if the Symba product left behind was legal and that the lawyer's response was "if they left it there after this period of time, they probably left it there because it was okay." (H. Aini, Trial Tr., 194, 202, July 25, 2011). M. Aini similarly testified that the criminal attorney advised them that after two months when the DA did not file formal charges, they were allowed to sell the Symba product that was left behind. (M. Aini, Trial Tr., 444-45, July 26, 2011). J. Aini likewise testified that the lawyer told him that since the DA was in the warehouse for so many hours that if the product was left, whichever product it was, "it's probably okay." (J. Aini, Trial Tr., 652, July 27, 2011). The Court found the Ainis' testimony that they relied on their criminal lawyer's advice to continue to sell Symba products that were left behind not to be credible. ICE and IBE-NY sold Symba soap and cream after the July 2001 Queens DA seizure. (H. Aini, Trial Tr., 193, July 25, 2011 (IBE-NY); M. Aini, Trial Tr., 384, July 26, 2011 (ICE); Plaintiff's Exhibit 22, at 1166-1180; Plaintiff's Exhibit

26

23, at 1251-56; Plaintiff's Exhibit 24, at 1304-07).

36. H. Aini testified that he believed the product he had was genuine and still does. (H. Aini, Trial Tr., 195-96, July 25, 2011; H. Aini, Trial Tr., 1298-1301, August 1, 2011). H. Aini stated that "[w]hen you are in the business as long as I have, you know when something is genuine." (H. Aini, Trial Tr., 1316, August 1, 2011). H. Aini further testified that "I have never been more certain that the products that I was selling were genuine" because he did not receive any complaints about the product. (H. Aini, Trial Tr., 1317-1318, August 1, 2011).

37. Sarner testified unless someone was a regular user of the product they probably would not be able to tell the difference between the counterfeit and genuine Symba. (Sarner, Trial Tr., 929, July 28, 2011; Sarner, Trial Tr., 1249, August 1, 2011).

38. H. Aini testified that neither J. Aini nor M. Aini ever told him prior to the Queens DA seizure that there was counterfeit Symba in the marketplace. (H. Aini, Trial Tr., 201, July 25, 2011; H. Aini, Trial Tr., 1352-53, August 1, 2011). The Court found this testimony not to be credible.

39. M. Aini testified that he was aware there was counterfeit Symba product in the market beginning at least in early 1999. (M. Aini, Trial Tr., 375, July 26, 2011).

40. After the filing of this action on November 15, 2001, based on an ex parte Order to Show Cause signed by Judge John Gleeson on November 15, 2001 (Rec. Doc. 2, also Plaintiff's Exhibit 20), plaintiff conducted a second seizure at 56-25 Flushing Avenue on November 20, 2001 and confiscated counterfeit Symba soap and Symba cream. (Report and Recommendation dated September 22, 2006 (Rec. Doc. 338, at 16 and

30-34), adopted in pertinent part by Opinion and Order of United States District Judge Sandra J. Fuerstein dated March 22, 2007 (Rec. Doc. 354)).

41. M. Aini testified that he was present for the November 2001 seizure and that after that seizure he inspected the premises to see if there was more Symba product and found nothing.  (M. Aini, Trial Tr., 388, July 26, 2011).

42. Plaintiff and defendants entered into a consent Preliminary Injunction Order of December 11, 2001 that prohibited defendants from "using products bearing plaintiff Martal Comestics, Ltd.'s . . . Symba trademarks" and "[f]rom possessing, receiving, manufacturing, assembling, distributing, warehousing, shipping, transshipping, transferring, storing, advertising, promoting, offering, selling, offer or holding for sale, disposing, or in any other manner handling or dealing with any good packaging, wrappers, containers and recepticals [sic], and any catalogues, price lists, promotional materials and the like bearing a copy or colorable imitation of the Symba trademarks and/or the Symba trade dress." (Rec. Doc. 11, Order including Preliminary Injunction).

43. It is law of the case that between March 24, 2002 and April 3, 2003, the Kessler Firm, Martal's investigators, made purchases of counterfeit soap from retailers including Homeboys.  (Report and Recommendation dated September 22, 2006 (Rec. Doc. 338, at 17), adopted in pertinent part by Opinion and Order of United States District Judge Sandra J. Fuerstein dated March 22, 2007 (Rec. Doc. 354)).

44. On April 24, 2002, the plaintiff conducted a final seizure, pursuant to Judge John Gleeson's April 16, 2002 Order to Show Cause for Additional Ex Parte Seizure,

confiscated counterfeit Symba cream and soap from the 56-25 Flushing Avenue warehouse.  (Report and Recommendation dated September 22, 2006 (Rec. Doc. 338, at 17), adopted in pertinent part by Opinion and Order of United States District Judge Sandra J. Fuerstein dated March 22, 2007 (Rec. Doc. 354)).  Further, it is law of the case that the "third space" was part of the 56-25 Flushing Avenue warehouse and that defendants controlled the "third space," where the Symba product was found on April 24, 2002.  (Report and Recommendation dated July 25, 2002 (Rec. Doc. 88, at 12), adopted by Judge John Gleeson by Order dated August 30, 2002 (Rec. Doc. 112)).   Further, defendants and their counsel were sanctioned for making the argument that an unrelated entity owned the goods seized and that the "third space" was not part of the 56-25 Flushing Avenue warehouse. (Report and Recommendation dated September 6, 2002 (Rec. Doc. 117, at 16), adopted by Judge John Gleeson by Order dated March 27, 2003 (Rec. Doc. 155)).  The Court does not credit H. Aini's testimony that he did not have access to the "third space," (H. Aini, Trial Tr., 210, July 25, 2011), H. Aini's testimony that IBE-NY did not obtain any Symba product from the "third space" (H. Aini, Trial Tr., 1343-44, August 1, 2011) or M. Aini's testimony that he did not know that there was Symba in the "third space." (M. Aini, Trial Tr., 429-30, July 26, 2011).

45. H. Aini testified that he did not sell any Symba products after the injunction in December 2001.  (H. Aini, Trial Tr., 1344, August 1, 2011).

## V.     Defendants' Affirmative Defense of Fraud on PTO

46. It is law of the case that in 1985 the United States Patent and Trademark Office

(PTO) issued a certificate for registration of Symba soap (No. 1,372,091) and that registration is valid.  (Report and Recommendation dated September 22, 2006 (Rec. Doc. 338, at 27-29), adopted in pertinent part by Opinion and Order of United States District Judge Sandra J. Fuerstein dated March 22, 2007 (Rec. Doc. 354)).

47. Martal filed its 368 trademark application on April 17, 1987. (Plaintiff's Exhibit 133, at 5235).   The application required the applicant to state whether it was in compliance with the Federal Food, Drug and Cosmetic Act, which requires packaged goods "to bear the names and address of the manufacturer, distributor or packer or the goods, the common or usual name of the goods, a statement of the ingredients, if applicable, and the net quantity of the contents." (Plaintiff's Exhibit 133, at 5230). Plaintiff's American trademark attorney, Susan T. Brown, responded on September 29, 1987 to an inquiry from the Patent and Trademark Office regarding the application, that "[a]pplicant advises that at the time the application was filed, all products bearing this mark were labeled in compliance with the Federal Food, Drug and Cosmetic Act." (Plaintiff's Exhibit 133, at 5232).  Sarner testified that he never communicated with Brown directly and that Brown would have communicated with A.J. Axe, Martal's UK trademark lawyer.  (Sarner, Trial Tr., 1060-61, July 29, 2011; Sarner, Trial Tr., 1269-70, August 1, 2011).

48. Sarner testified that when Martal filed its April 17, 1987 trademark application he was awaiting communication from the FDA on the packaging changes.  (Sarner, Trial Tr., 1064-65, July 29, 2011).  Sarner further testified that he believed the repackaging was completed before he received the 368 trademark.  (Sarner, Trial Tr., 1193,

August 1, 2011).  Sarner testified that the repackaging took longer than expected because Martal had to wait for a response from the FDA.  (Sarner, Trial Tr., 1193-94, August 1, 2011).  Sarner testified that it took 2 or 3 years to get the packaging sorted out with the FDA.  (Sarner, Trial Tr., 1273, August 1, 2011).  Defendants' Exhibit 50 supports Sarner's testimony — it is a letter dated August 23, 1988 from Sarner to the FDA that references revised packaging that was submitted to the FDA in June 1988.

49. Martal's British trademark lawyer A.J. Axe wrote on April 29, 1985, that Symba goods "were not in compliance with the requirements of the Federal Food, Drug and Cosmetic Act regarding labeling at the time this application was being made" and further stated "[s]upplies destined for sale in the U.S. will be properly labeled when they arrive there which will be quite soon." (Plaintiff's Exhibit 137, at 5263; Sarner, Trial Tr., 1006-15, July 29, 2011).  The letter, which references the trademark application for Symba soap, states that "the applicant has been awaiting the result of this application before committing resources to labeling and packaging, literature and so forth."  (Plaintiff's Exhibit 137, at 5264).  The letter further supports Sarner's testimony that Martal began repackaging after receiving the 091 registration for Symba soap.

50. Sarner testified that Martal changed the Symba packaging at some point between late 1986 and early 1988, but could not remember the exact date.  (Sarner, Trial Tr., 857, July 28, 2011).  He later testified that the packaging was changed in time for his 1987 trademark application.  (Sarner, Trial Tr., 974, July 28, 2011).  Although Sarner testified that until 1989, when he started selling directly to the United States through

the Ainis, the Symba product was not packaged to comply with the FDA regulations (Sarner, Trial Tr., 969-70, July 28, 2011), the Court notes that he more fully explained at a later point in his testimony that the change in the packaging occurred before the shipments to J. Aini in 1988 or 1989.  (Sarner, Trial Tr., 1015, July 29, 2011).

51. Sarner testified that he was aware that Symba products were entering the United States in the 1980s.  Sarner testified to three bases for his belief that his products were entering the United States.  First, that he received letters and visits in his UK pharmacy from people who had tried his product in the United States and he sent some of the product to individuals in the United States during the period 1983 to 1985 through the mail.  (Sarner, Trial Tr., 834-35, 850, July 28, 2011; Sarner, Trial Tr., 1107, 1110-11, July 29, 2011; Sarner, Trial Tr., 1221-22, 1266-67, August 1, 2011).  Second, he understood that the product was being brought to the United States by Nigerian importers and offered for sale. (Sarner, Trial Tr., 850, 902, July 28, 2011; Sarner, Trial Tr., 1266-67, August 1, 2011).  J. Aini testified that in 1987 his company ABCE New York was selling Symba products in the United States imported from ABCE Nigeria.  (J. Aini, Trial Tr., 547, 667-70, July 27, 2011).  Third, in 1984, Sarner arranged with a Canadian customer to send a small shipment of Symba soap, cream and perfume to New York to test the market. (Sarner, Trial Tr., 838, July 28, 2011; Sarner, Trial Tr., 1111-12, July 29, 2011; Plaintiff's Exhibit 137).

52. Sarner was deposed by telephone on November 16, 2006 and on January 24, 2007 he

submitted an errata sheet to opposing counsel.  (Trial Tr., 1077, 1080, July 29, 2011).

Sarner testified at trial that he had not remembered at his deposition that the

shipments of Symba he made to J. Aini were not the first shipments to enter the

United States.  (Sarner, Trial Tr., 1082, July 29, 2011).  Sarner's errata sheet

contained a preliminary statement that before he gave his deposition he took four

times his usual dose of his prescription medication to reduce cardiac stress, but as a

side effect of the medication it made him drowsy.  (Sarner, Trial Tr., 1083-85, July

29, 2011).  Sarner's mistake in his deposition and subsequent correction in no way

affects the Court's view of his credibility based on the Court's observation of and

interaction with him during the trial and the record as a whole.  Sarner corrected his

error when he read his deposition.  (Sarner, Trial Tr., 1095-96, July 29, 2011).

53. Sarner testified that Martal created Symba lotion in about 1984.  (Sarner, Trial Tr.,

857, July 28, 2011).  Sarner testified that Martal received reports that Symba lotion

and perfume were in commerce in the United States in 1986 and 1987.  (Sarner, Trial

Tr., 828-34, July 28, 2011).  The Court credits Sarner's trial testimony, even though

in his written responses to questions submitted by defendants, signed by Sarner on

July 16, 2003, he stated that in January 1984 there was no Symba lotion or perfume

"used in commerce" and that Martal first sold Symba lotion and perfume in the

United States in 1989, but sold Symba soap and cream first in 1984.  (Defendants'

Exhibit 120).  Sarner testified at trial that he made a mistake in his written deposition.

(Sarner, Trial Tr., 1070-72, July 29, 2011).  Sarner testified at trial that when Martal

filed for its 368 trademark application in April 1987, he believed that Symba lotion,

cream, soap and perfumes were in commerce in the United States.  (Sarner, Trial Tr., 850, 854-56, July 28, 2011).  His testimony is confirmed by Plaintiff's Exhibit 131, which is a letter from Axe dated March 24, 1987 to Sarner confirming that the 368 trademark application should list only "skin lotions, skin creams, soaps and perfumes" and not other items because those other items were not currently available for sale in the United States.  (Plaintiff's Exhibit 131).

54. Sarner testified the Symba product in the early 1980s did not comply with United States regulations and did not have the correct labeling. (Sarner, Trial Tr., 843, July 28, 2011).

## VI. Damages

55. J. Aini testified that IBE-FL sold a product that competed with Symba called Crusader, and that he was having "much more" success with the Crusader brand.  (J. Aini, Trial Tr., 684-85, July 27, 2011).  H. Aini testified that Crusader and Symba's sales were "almost on par" during the 1999-2001 time period.  (H. Aini, Trial Tr., 1308-09, August 1, 2011).  Sarner's March 12, 1999 letter to Symcha Horowitz and J. Aini ending his sales relationship with IBE-FL acknowledged that competition, in addition to counterfeiting, was "having a profound effect on our sales." (Plaintiff's Exhibit 52).  Sarner testified at trial that competition was not a reason why sales dropped because he had a loyal customer base. (Sarner, Trial Tr., 948-49, July 28, 2011).  The Court notes the contradiction in Sarner's trial testimony and the statement made in his March 12, 1999 letter, but given the record as a whole, that contradiction does not affect the Court's view of Sarner's overall credibility.

56. Sarner testified that the product was never expensive, but that if a customer bought a counterfeit product without active ingredients they would not buy it again and, thus, the product's reputation was being destroyed. (Sarner, Trial Tr., 941-43, July 28, 2011).

57. Sarner testified that after he terminated his relationship with the Ainis in 1999 his sales dropped because he did not initially have a good distributor after that and because the product had been "severely damaged by the counterfeit that was in the market." (Sarner, Trial Tr. 946-47, July 28, 2011).

58. During the period 1999 to 2001, Martal's sales volume to the United States in cases was:

|       | Soap  | Cream |
|-------|-------|-------|
| 1999  | 905   | 2,451 |
| 2000  | 1,727 | 2,181 |
| 2001  | 2,025 | 2,025 |

(Stipulation 4, Rec. Doc. 514).

59. During the period 2003 to 2005, after distribution of counterfeit Symba product was halted, Martal's sales volume to the United States in cases was:

|       | Soap  | Cream |
|-------|-------|-------|
| 2003  | 3,926 | 4,699 |
| 2004  | 3,888 | 2,644 |
| 2005  | 4,490 | 2,957 |

(Stipulation 2, Rec. Doc. 512).

60. During the period 1996 to 1998, Martal's invoices to IBE-FL reflect the following volume in cases:

|       | Soap  | Cream |
|-------|-------|-------|
| 1996  |       | 801   |

| 1997 | 851 | 3,807 |
| 1998 | 924 | 2,655 |

(Stipulation 3, Rec. Doc. 513).   However, Sarner testified that he was selling to other distributors in the United States from 1995 to 1999.  (Sarner, Trial Tr., 1171-72, August 1, 2011).

61. ICE invoices from 1999 to 2001 and undated invoices showed the following sales totals in cases (Plaintiff's Exhibit 24):

| Year | Symba soap | Symba cream |
| --- | --- | --- |
| 1999 | 12 | 12 |
| 2000 | 244 | 34 |
| 2001 | 69 | 55 |
| Undated | 73 | 66 |
| Total | 398 | 169 |

From 1999 to the November 2001 seizure, H. Aini testified that ICE's sales were recorded by handwritten invoices, but they were not in chronological order and some were undated.  (H. Aini, Trial Tr., 1387-93, August 2, 2011).  H. Aini testified that the price IBE-NY paid ICE was $60/case for the Symba soap and $108/case for Symba cream and ICE's gross profit margin was 30 percent.  (H. Aini, Trial Tr., 1313-15, August 1, 2011).  The total gross profit ICE earned on the sales reflected in invoices presented at trial and based on a 30 percent profit margin from 1999 to 2001 was $9,552 on Symba soap and $6,591 on Symba cream.

62. IBE-NY invoices from 1999 to 2001 showed the following sales totals in cases (Plaintiff's Exhibit 24):

| Year | Symba soap | Symba cream |
| --- | --- | --- |
| 1999 | 14 | 22 |
| 2000 | 21 | 21 |
| 2001 | 22 | 19 |

| Total | 57 | 61 |
|---|---|---|

H. Aini testified that IBE-NY sold Symba soap for $89.28/case and Symba cream for $158.40/case.  (H. Aini, Trial Tr., 1322-23, August 1, 2011).  H. Aini testified that from 1999 until the November 2001 seizure, all IBE-NY sales were recorded in invoices, which were computer generated and were kept in chronological order (H. Aini, Trial Tr., 1319-25, August 1, 2011).  The total gross profit IBE-NY earned on the sales reflected in invoices from 1999 to 2001 was $1,668.96 on Symba soap and $3,074.40 on Symba cream.

63. M. Aini testified that he did not know whether ICE obtained Symba soap and cream from IBE-FL from 1999 to 2001.  (M. Aini, Trial Tr., 362-63, July 26, 2011).

64. H. Aini and M. Aini testified that in 2000 ICE was running low on stock of Symba cream, so IBE-NY bought 30 cases directly from IBE-FL and that IBE-FL obtained the Symba from Carib. (H. Aini, Trial Tr., 213-216, July 25, 2011; M. Aini, Trial Tr., 366-67, July 26, 2011; H. Aini, Trial Tr., 1396-97, August 2, 2011; Plaintiff's Exhibits 27 and 28).  However, M. Aini testified that during the period January 2000 to June 2000, the invoices showed that ICE sold Symba cream only to IBE-NY, to no other customers. (M. Aini, Trial Tr., 370-73, July 26, 2011).

65. H. Aini testified that IBE-NY received Symba product from ICE, Carib (via IBE-FL) and Arta.  (H. Aini, Trial Tr., 1328, August 1, 2011).  H. Aini testified he believed the Symba product from all three distributors was genuine, based on the reputation of the corporations and their owners.  (H. Aini, Trial Tr., 1328-29, August 1, 2011).

66. H. Aini testified that in 2000 IBE-NY purchased 225 cases of Symba soap and 200

cases of Symba cream from Arta, even though in the period 1999 to 2001 the invoices showed IBE-NY had only sold 57 cases of Symba soap and 61 cases of Symba cream.  (H. Aini, Trial Tr., 1460-68, 1469-71, 1478 August 2, 2011).

67. IBE-NY also acquired Symba product from KAK when it was formed in 1999 and H. Aini knew that KAK had purchased Symba from Arta before H. Aini bought the assets of KAK to form IBE-NY in 1999. (H. Aini, Trial Tr., 1329-30, August 1, 2011).

68. Invoices showed the IBE-NY purchased approximately 200 cases of Symba soap and 162 cases of Symba cream from ICE from 1999 to 2001 (Plaintiff's Exhibits 23 and 24).

69. Based on H. Aini's testimony and the invoices presented at trial, during the period 1999 to 2001 IBE-NY acquired over 392 cases of Symba cream and 425 cases of Symba soap.

70. H. Aini testified that IBE-NY did not acquire any Symba product after July 2001. (H. Aini, Trial Tr., 1343, August 1, 2011).

## *Conclusions of Law*

### I.      Defendants' Affirmative Defense of Fraud on the PTO

1. A trademark infringement claim is subject to the affirmative defense of fraud. 15 U.S.C. § 1115(b)(1).  "Fraud in procuring a trademark occurs when 'an applicant knowingly makes false, material representations of fact in connection with an application.'"  *De Beers LV Trademark Ltd. v. DeBeers Diamond Syndicate, Inc.*, 440 F. Supp. 2d 249, 266 (S.D.N.Y. 2006) (*quoting L.D. Kichler Co. v. Davoil, Inc.*,

192 F.3d 1349, 1351 (Fed. Cir. 1999)).  The fraud must be demonstrated by "clear and convincing evidence."  *Orient Exp. Trading Co. v. Federated Dept. Stores, Inc.*, 842 F.2d 650, 653 (2d Cir. 1988). "The allegedly fraudulent statements may not be the product of mere error or inadvertence, but must indicate a 'deliberate attempt to mislead the [PTO].'" *Id.* (*quoting Money Store v. Harriscorp Finance, Inc.*, 689 F.2d 666, 670 (7th Cir.1982)).  "Moreover, the knowing misstatement must have been with respect to a *material* fact-one that would have affected the PTO's action on the applications." *Id.* (emphasis in original) (*citing Citibank, N.A. v. Citibanc Group, Inc.*, 724 F.2d 1540, 1544 (11th Cir. 1984) and *Rick v. Buchansky*, 609 F. Supp. 1522, 1536-37 (S.D.N.Y.)).

2. Defendants have failed to establish by clear and convincing evidence that plaintiff committed fraud on the PTO.  The Court finds that defendants have failed to establish by clear and convincing evidence that Symba lotion and perfume were not in commerce at the time of the filing of the 368 trademark application in April 1987 (Finding of Fact 53; see also Report and Recommendation dated September 22, 2006 (Rec. Doc. 338, at 23-27) (finding question of fact on issue to preclude summary judgment), adopted in pertinent part by Opinion and Order of Judge Sandra J. Fuerstein dated March 22, 2007 (Rec. Doc. 354)).  The Court also finds defendants have failed to establish by clear and convincing that there was not token use of the Symba product in the United States and intent to engage in continuing the use. Findings of Fact 51-54; *La Societe Anonyme des Parfums le Galion v. Jean Patou, Inc.*, 495 F.2d 1265, 1271 (2d Cir. 1974) ("Adoption and a single use of the mark

may be sufficient to entitle the user to register the mark."); *General Mills Inc. v. Health Valley Foods*, 1992 WL 296518, at *2, 24 U.S.P.Q. 2d 1270 (Trademark Tr. & App. Bd. 1992)("[A] token sale or a single shipment in commerce, with the color of a bona fide transaction, may be sufficient to support an application for registration provided that it is followed by other shipments or accompanied by activities or circumstances which would indicate a continuing effort or intent to continue such use and place the product on the market on a commercial scale."); *Wallace Computer Services, Inc. v. Sun Microsystems, Inc.*, 1989 WL 69286, 13 U.S.P.Q.2d 1324, 1326 (N.D. Ill. 1989) ("In this case, though the final product was not marketed until over two years after the first use, defendants have shown their intent to engage in continuing commercial use.").

3.  The Court further finds that defendants have failed to establish by clear and convincing evidence that Brown's statement to the PTO regarding labeling (Finding of Fact 47) was fraudulent.  The Court credits Sarner's testimony that packaging changes had been made when the application was filed and that the process was delayed due to communications with the FDA. (*See* Findings of Fact 48-50). Brown's statement was not a "deliberate attempt to mislead the [PTO]."  *Orient Exp. Trading Co.*, 842 F.2d at 653.

4.  Based on Magistrate Judge James Orenstein's Report and Recommendation dated September 22, 2006 (Rec. Doc. 338, at 26-27), adopted in pertinent part by Opinion and Order of United States District Judge Sandra J. Fuerstein dated March 22, 2007 (Rec. Doc. 354), as defendants have failed to establish their affirmative defense by

clear and convincing evidence at trial, plaintiff prevails on its Lanham Act claim regarding the 368 registration against defendants H. Aini, M. Aini, KAK, Homeboys International, IBE-NY, and ICE.

5. Thus, based on Conclusions of Law 4, 9, 13 and 17, the Court finds plaintiff prevails on its state law claim of unfair competition for the 368 mark against defendants J. Aini, M. Aini, H. Aini, ICE, IBE-NY and Homeboys International.  "[T]he essence of unfair competition under New York common law is 'the bad faith misappropriation of the labors and expenditures of another, likely to cause confusion or to deceive purchasers as to the origin of the goods.'" *Jeffrey Milstein, Inc. v. Greger, Lawlor, Roth, Inc.*, 58 F.3d 27, 34 (2d Cir. 1995) (*quoting Rosenfeld v. W.B. Saunders, A Division of Harcourt Brace Jovanovich, Inc.,* 728 F. Supp. 236, 249-50 (S.D.N.Y. 1990).  "The standard of unfair competition under New York law is a virtual cognate of the federal Lanham Act . . . ." *Bangkok Crafts Corp. v. Capitolo di San Pietro in Vaticano*, 331 F. Supp. 2d 247, 255 (S.D.N.Y. 2004); *see also* Report and Recommendation dated September 22, 2006 (Rec. Doc. 338, at 36-37), adopted in pertinent part by Opinion and Order of United States District Judge Sandra J. Fuerstein dated March 22, 2007 (Rec. Doc. 354).  The Court awards no damages for plaintiff's state law claims of unfair competition as plaintiff will be fully compensated by the Court's award of statutory damages (Conclusions of Law 18).

6. The Court finds that plaintiff has failed to establish the elements of an unjust enrichment claim under New York common law (*see* Conclusions of Law 15.a and 15.b).  "Cases dealing with unjust enrichment in New York are uniform in their

recognition of three elements of the claim: 'To prevail on a claim for unjust enrichment in New York, a plaintiff must establish (1) that the defendant benefitted; (2) at the plaintiff's expense; and (3) that equity and good conscience require restitution.'" *Beth Israel Medical Center v. Horizon Blue Cross and Blue Shield of New Jersey, Inc.*, 448 F.3d 573, 586 (2d Cir. 2006) (*quoting Kaye v. Grossman*, 202 F.3d 611, 616 (2d Cir. 2000)); *see also Johnson & Johnson Consumer Companies, Inc. v. Aini,* 540 F. Supp. 2d 374, 395 (E.D.N.Y. 2008) ("The court need not address Plaintiff's unjust enrichment claim because Plaintiff does not seek to recover Defendants' profits.").  The Court notes that plaintiff's pre-trial proposed Findings of Fact and Conclusions of Law stated that plaintiff would only seek actual damages for its claim of unjust enrichment if the Court found for defendants on their affirmative defense invalidating the 368 trademark registration.  (Rec. Doc. 500, at 17 fn. 6). Judgment will be entered in favor of defendants on plaintiff's claim for unjust enrichment.

7. Plaintiff has established its claim for injury to business reputation under New York General Business Law Section 368-d, which the Court notes was repealed in 1997 and replaced with New York General Business Law Section 360–l, *New York Stock Exchange, Inc. v. New York, New York Hotel LLC*, 293 F.3d 550, 557 (2d Cir. 2002), for the 368 mark by a preponderance of the evidence. Report and Recommendation dated September 22, 2006 (Rec. Doc. 338, at 36-37), adopted in pertinent part by Opinion and Order of United States District Judge Sandra J. Fuerstein dated March 22, 2007 (Rec. Doc. 354); *see also Johnson & Johnson Consumer Companies, Inc. v.*

*Aini*, 540 F. Supp. 2d 374, 394-95 (E.D.N.Y. 2008).  Section 360-l provides:

> Likelihood of injury to business reputation or of dilution of the distinctive quality of a mark or trade name shall be a ground for injunctive relief in cases of infringement of a mark registered or not registered or in cases of unfair competition, notwithstanding the absence of competition between the parties or the absence of confusion as to the source of goods or services.

The Court will enter a permanent injunction against defendants.  *Patsy's Italian Restaurant, Inc. v. Banas*, 575 F. Supp. 2d 427, 456 (E.D.N.Y. 2008); Conclusions of Law 23 and 24.

### II.    J. Aini's Individual Liability

8. Individual liability of a corporate officer is established when the individual is a "moving, active and conscious force behind [the defendant corporation's] infringement."  *Bambu Sales, Inc. v. Sultana Crackers, Inc.*, 683 F. Supp. 899, 913 (E.D.N.Y. 1988) (*quoting Polo Fashions, Inc. v. Branded Apparel Merch.*, 592 F. Supp. 648, 652 (D. Mass. 1984)).

9. The Court finds that J. Aini, as secretary and buyer for ICE, was a "moving, active and conscious force" behind ICE's infringement, particularly given his involvement with contacting Martal regarding the counterfeit Symba (Findings of Fact 12 and 15).

### III.    R. Aini's Individual Liability

10. Although the Court found her testimony less than forthcoming and not to be credible, the plaintiff has not demonstrated by a preponderance of the evidence that R. Aini was "a moving, active and conscious force" behind Homeboys' infringement or of any of the other defendant corporations' infringement.  *Bambu Sales, Inc.*, 683 F. Supp. at 913.

### IV.    Statutory damages

11. 15 U.S.C. § 1117(c) provides that "[i]n a case involving the use of a counterfeit mark
. . . in connection with the sale, offering for sale, or distribution of goods or services,
the plaintiff may elect, at any time before final judgment is rendered by the trial
court, to recover, instead of actual damages and profits under subsection (a) of this
section, an award of statutory damages for any such use in connection with the sale,
offering for sale, or distribution of goods or services."   Further, § 1117(c)(2)
provides: "if the court finds that the use of the counterfeit mark was willful, not more
than $1,000,000 per counterfeit mark per type of goods or services sold, offered for
sale, or distributed, as the court considers just."[2]

12. "The standard for willfulness is 'whether the defendant had knowledge that [his]
conduct represented infringement or perhaps recklessly disregarded the possibility.'"
*Motorola, Inc. v. Abeckaser*, No. 07-CV-3963 (CPS)(SMG), 2009 WL 962809, at *8
(E.D.N.Y. April 8, 2009) (*quoting Kepner-Treqoe, Inc. v. Vroom,* 186 F.3d 283, 288
(2d Cir.1999).

13. The Court finds that the record establishes by a preponderance of the evidence that
the individual defendants J. Aini, H. Aini and M. Aini and corporate defendants
Homeboys International, ICE and IBE-NY willfully infringed on Martal's mark

---

[2] The Court notes 15 U.S.C. § 1117(c)(2) was amended in 2008 to increase the maximum statutory
amount to $2,000,000.   Plaintiff is not seeking the increased amount (Rec. Doc. 518, at 42-43) and
the Court must apply the statute as it existed at the time of the infringing conduct. *Chanel, Inc. v.
Louis*, No. 06-cv-5924 (ARR)(JO), 2009 WL 4639674, at *11 (E.D.N.Y. Dec. 7, 2009)("[T]he
plaintiffs have not requested that the court apply the new version of the statute, and I conclude it
would be appropriate to apply the earlier version rather than give the amendment retroactive
effect."); *see also Louis Vuitton S.A. v. Spencer Handbags Corp.*, 765 F.2d 966, 970-72 (2d Cir.
1985).

based on their continued sale of Symba after the July 2001 seizure (Finding of Fact 35); by violating the consent preliminary injunction issued December 12, 2001 (Rec. Doc. 11) by being in possession and control of Symba products at the time of the final seizure in April 2002, after having agreed not to possess Symba products (Findings of Fact 42-44); and by the continuing sale of counterfeit Symba products at Homeboys as late as March or April 2002 (Report and Recommendation dated September 22, 2006 (Rec. Doc. 338, at 17 and 34), adopted in pertinent part by Opinion and Order of United States District Judge Sandra J. Fuerstein dated March 22, 2007 (Rec. Doc. 354)).  Further, defendants J. Aini, M. Aini and H. Aini gave conflicting testimony regarding their ownership and activities in the hydra of defendant corporations and other non-party corporations owned by their family. (Findings of Fact 5 and 6).

14. "Congress added the statutory damages provision of the Lanham Act in 1995 because 'counterfeit[ers'] records are frequently nonexistent, inadequate, or deceptively kept ... making proving actual damages in these cases extremely difficult if not impossible.'" *Motorola, Inc.*, 2009 WL 962809, at *8 (*quoting Microsoft Corp. v. Computer Care Center, Inc.,* No. 06-CV-1429, 2008 WL 4179653, at *8 (E.D.N.Y. Sept. 10, 2008)).

15. "The statute 'does not provide guidelines for courts to use in determining an appropriate award,' as it is only limited by what 'the court considers just.'  However, courts have found some guidance in the caselaw of an analogous provision of the Copyright Act, which also provides statutory damages for willful infringement."

*Gucci America, Inc. v. Duty Free Apparel, Ltd.*, 315 F.Supp.2d 511, 520 (S.D.N.Y. 2004) (*citations omitted*) (*quoting Louis Vuitton Malletier v. Veit,* 211 F.Supp.2d 567, 583 (E.D. Pa. 2002)) (*citing Sara Lee Corp. v. Bags of N.Y., Inc.,* 36 F. Supp. 2d 161, 166 (S.D.N.Y. 1999)). "Under the Copyright Act, courts look to factors such as: (1) 'the expenses saved and the profits reaped;' (2) 'the revenues lost by the plaintiff;' (3) 'the value of the copyright;' (4) 'the deterrent effect on others besides the defendant;' (5) 'whether the defendant's conduct was innocent or willful;' (6) 'whether a defendant has cooperated in providing particular records from which to assess the value of the infringing material produced;' and (7) 'the potential for discouraging the defendant.'" *Id.* (*quoting Fitzgerald Pub. Co., Inc. v. Baylor Pub. Co.,* 807 F.2d 1110, 1117 (2d Cir. 1986)).

    a.  In determining the expenses saved and profits reaped by the defendants, the Court notes that ICE's invoices were handwritten, not consecutive and some were undated and that M. Aini did not know whether he purchased Symba from IBE-FL during the 1999 to 2001 period.  (Findings of Fact 61 and 63).  Given the state of ICE's records, it is not possible to determine the profits reaped by ICE.  Further, the Court notes that based on H. Aini's testimony, IBE-NY acquired significantly more Symba product than its records indicate it sold. (Findings of Fact 64-69).  Plaintiff relies on dicta from United States Magistrate Judge James Orenstein's September 22, 2006 Report and Recommendation for the amount of Symba products seized in the July 2001, November 2001 and April 2002 seizures (Rec. Doc. 520, Schedule A), but no

evidence was presented at trial about the actual amounts seized other than J. Aini's testimony that at that July 2001 seizure "one van full of merchandise," including but not limited to Symba products, was seized.  (J. Aini, Trial Tr., 702, July 27, 2011).

b. Based on the sparse record before the Court, Martal's sales volume increased in the period 2003 to 2005, once counterfeiting stopped, as compared to Martal's sales volume in the United States during the infringement period from 1999 to 2001.  (Finding of Fact 58-59).  However, as Sarner testified, counterfeiting was not the only possible reason for lower sales volume — he conceded that he had to find another distributor after he ended his relationship with the Ainis (Finding of Fact 57) and he acknowledged competition in his letter to the IBE-FL in March 1999 (Finding of Fact 55).

c. Martal did not introduce any evidence of the value of its trademark.  (Trial Tr., 1229-33, August 1, 2011).

d. The deterrent effect on others besides the defendants is potentially great in this case.  The Court notes that other members of the Aini family are involved in the health and beauty supply business (Finding of Fact 5.d and 5.f) and the Ainis have been involved in the health and beauty supply business for many years (Finding of Facts 5.f and 7).

e. The Court has determined that the defendants' conduct was willful. (Conclusion of Law 13).

f. The invoices that were introduced as evidence in this proceeding were confiscated in the November 2001 seizure, thus the Court does not find that defendants cooperated in providing records.

g. The Court finds that an award of statutory damages has great potential to discourage the defendants, because the Ainis are heavily involved in the health, beauty and cosmetics industry and J. Aini has been involved in other trademark violations.  (Findings of Fact 5, 10, and 11).

16. Accordingly, based on their willful violations of 15 U.S.C. §§ 1114 and 1125, plaintiff is awarded statutory damages under 15 U.S.C. § 1117(c)(2) in the amount of $375,000 for each mark, or a total of $750,000, jointly and severally, against defendants J. Aini, M. Aini, H. Aini, ICE, IBE-NY and Homeboys International.

17. Plaintiff has not demonstrated by a preponderance of the evidence that defendants KAK or Homeboys Discount willfully infringed on its trademark.  (Findings of Fact 5.a and 5.c).  The Court further notes that Magistrate Judge James Orenstein in his Report and Recommendation of September 22, 2006, adopted in pertinent part by the Opinion and Order of United States District Judge Sandra J. Fuerstein dated March 22, 2007 (Rec. Doc. 354), treated Homeboys Discount and Homeboys International collectively (Rec. Doc. 338, at 2 and 34), which was understandable based on the record before the judges at that time; however, the evidence before the Court at trial was that Homeboys Discount ceased to exist in 1995 when H. Aini and M. Aini purchased its assets and created Homeboys International (Finding of Fact 5.a).  Thus, the Court finds and therefore holds, that the September 22, 2006 finding, adopted by

48

the Opinion and Order of Honorable Judge Sandra J. Fuerstein on March 22, 2007 (Rec. Doc. 354, at 8-9), that "Homeboys" was liable to plaintiff for counterfeiting applied only to Homeboys International and not to Homeboys Discount.  The Court awards plaintiff $2,500 per mark, for a total of $5,000, against defendant KAK, as it is law of the case that KAK sold counterfeit Symba products. (Rec. Doc. 338, at 34).

**V.     Punitive Damages**

18. Because the Court finds that the 368 Registration was valid and awards plaintiff statutory damages, plaintiff is not seeking punitive damages (Rec. Doc. 518, at 45 fn. 35), and the Court will not award punitive damages to plaintiff on its state law claim for unfair competition.  *Malletier v. Carducci Leather Fashions, Inc.*, 648 F. Supp. 2d 501, 506 (S.D.N.Y. 2009) ("The substantial sum that I previously have recommended as a statutory damages award under the Lanham Act includes a punitive component.  Accordingly, [plaintiff] is not entitled to an additional award under New York law.").

**VI.    Attorney Fees and Costs**

19. The Lanham Act authorizes the award of attorney fees to prevailing parties in "exceptional cases." 15 U.S.C. § 1117(a).  The Second Circuit has stated that "exceptional cases" means instances of "fraud or bad faith," or "willful infringement." *Patsy's Brand, Inc. v. I.O.B. Realty, Inc.*, 317 F.3d 209, 221 (2d Cir. 2003); *Bambu Sales, Inc. v. Ozak Trading Inc.*, 58 F.3d 849, 854 (2d Cir. 1995) ("'Exceptional' circumstances include willful infringement.").

20. The Court has determined that defendants J. Aini, M. Aini, H. Aini, ICE, IBE-NY

and Homeboys International's infringement was willful (Conclusion of Law 13) and therefore concludes that this is an "exceptional" case against them.  In further support of its finding that attorney fees are warranted the Court notes that M. Aini and J. Aini each contradicted themselves in this litigation about the ownership of defendant corporations (Finding of Fact 6.b.i, 6.c.i, 6.c.ii) and all three brothers have given conflicting testimony about the ownership of the Aini corporations (Finding of Fact 6).

21. Plaintiff seeks investigator fees as part of its claim for attorney fees and costs.  (Rec. Doc. 518, at 46).  *Chanel, Inc. v. Gardner*, No. 07 Civ. 6679(GBD)(MHD), 2011 WL 204911, at *6 (S.D.N.Y. January 21, 2011) ("Investigative fees may also be recoverable as expenses in trademark-infringement cases under the Lanham Act, if shown to be necessary and accompanied by proper documentation.").  The Court finds that the investigator was necessary to uncover the infringement and investigative fees are recoverable if plaintiff's counsel provides proper documentation of those fees.

22. The amount of attorney fees and costs, to include investigator fees, awarded by this ruling will be referred to the United States Magistrate Judge assigned to the case for report and recommendation.

## VII.   Permanent Injunction

23. "Under the case law of this circuit, a permanent injunction is warranted where a party has succeeded on the merits, and establishes:  (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate

to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and the defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *Mamiya America Corp. v. HuaYi Brothers, Inc.*, No. 09–CV–5501 (ENV)(JO), 2011 WL 1322383, at *8-*9 (E.D.N.Y. March 11, 2011) (citations omitted) (*quoting Salinger v. Colting*, 607 F.3d 68, 77 (2d. Cir. 2010)) (citing *Roach v. Morse*, 440 F.3d 53, 56 (2d Cir. 2006)).

24. The Court finds that J. Aini was the moving, active and conscious force in the trafficking in counterfeit Symba products and that the defendants failed to prove their affirmative defense of fraud for the 368 registration.   Therefore, the permanent injunction entered against the other defendants by the Court's Opinion and Order dated March 22, 2007, namely ICE, M. Aini, H. Aini, KAK, IBE-NY, Homeboys Discount and Homeboys International, barring any future trademark infringement based on the trademark infringement of Symba soap, (Rec. Doc. 354, at 9-10), is made applicable to J. Aini for Symba soap and applicable to defendants J. Aini, M. Aini, H. Aini, ICE, KAK, IBE-NY, and Homeboys International, for Symba cream. Specifically J. Aini, M. Aini, H. Aini, ICE, KAK, IBE-NY, and Homeboys International are prohibited from "[f]rom possessing, receiving, manufacturing, assembling, distributing, warehousing, shipping, transshipping, transferring, storing, advertising, promoting, offering, selling, offer or holding for sale, disposing, or in any other manner handling or dealing with any good packaging, wrappers, containers and receptacles, and any catalogues, price lists, promotional materials and the like bearing a copy or colorable imitation of the Symba trademarks and/or the Symba

trade dress."

**VIII.  Prejudgment interest.**

25. The Court has the discretion to award prejudgment interest in "exceptional cases." *Am. Honda Motor Co., Inc. v. Two Wheel Corp.,* 918 F.2d 1060, 1064 (2d Cir. 1990); *Mamiya America Corp.*, 2011 WL 1322383, at *8-*9.  The Court has previously found this to be an "exceptional case."  (Conclusion of Law 19-22).  However the Court finds by its award of statutory damages and attorney fees, plaintiff has been fully compensated based on the record as a whole and declines to exercise its discretion to award prejudgment interest.

## *Conclusion*

For the foregoing reasons the Court will enter judgment in favor of plaintiff, and against defendants J. Aini, M. Aini, H. Aini, ICE, IBE-NY and Homeboys International on plaintiff's Lanham Act claims in the sum of $750,000 and defendant KAK in the sum of $5,000.  Plaintiff is also awarded attorneys fees and costs under 15 U.S.C. § 1117(a) against defendants J. Aini, M. Aini, H. Aini, ICE, IBE-NY and Homeboys International.  The Court awards no damages to plaintiff for its state law unfair competition claims as plaintiff will be fully compensated by the Court's award of statutory damages.   The Court will enter judgment in favor of defendants on plaintiff's common law unjust enrichment claim. Further, the Court finds for plaintiff on its claim for injury to business reputation under New York General Business Law and the permanent injunction entered against the other defendants by the Court's Opinion and Order dated March 22, 2007, namely ICE, M. Aini, H. Aini, KAK, IBE-NY, Homeboys Discount and Homeboys International, barring any

future trademark infringement based on the trademark infringement of Symba soap, (Rec. Doc. 354, at 9-10), is made applicable to J. Aini for Symba soap and applicable to defendants J. Aini, M. Aini, H. Aini, ICE, KAK, IBE-NY and Homeboys International, for Symba cream.

Brooklyn, New York this 23rd day of August 2011.

_____
Tucker L. Melançon
United States District Judge